# UNITED STATES DISTRICT COURT.

## MARY A. SMITH agt. JOSEPH A. WILSON.

A *Court of Admiralty* has *jurisdiction*, in all cases of *wrongs* complained of committed on the high seas, or within the ebb and flow of the tide, where an action of *case*, or *trespass on the case* might be maintained for such wrongs in a court of common law jurisdiction.

The *master of a ship or vessel* stands, towards *women and minors*, in the relation of a *parent*, especially so when they are unaccompanied by a natural guardian. And in the eye of the law, he stands to all his passengers *in loco parentis*. They are entitled as matter of right, to his attention and protection.

No man of blunted moral sense, or of low intellectual range, or who does not possess a nice, delicate sense of honor, or whose experience of life is narrow and meagre, should be allowed to occupy the position of master of a ship.

Where the master of a coast steamer, suffered a notorious gambler—a passenger on his vessel, to decoy a young man of eighteen years of age, also a passenger, into playing upon a "sweat cloth," by which the latter lost $750, of money belonging to his widowed mother; *held*, that the master was liable, in admiralty, at the suit of the mother for the whole amount of the money and interest.

*Southern District of Alabama. In Admiralty.*

*Before Hon.* RICHARD BUSTEED, *U. S. District Judge.*

THE libellant is a widow woman, residing in South Carolina, and the respondent is the master of the Manhattan, one of the line of steam vessels plying between Mobile and New Orleans, for the carriage of passengers and freight. On the 23d of February, 1866, the plaintiff's son, a minor, eighteen years of age, took passage on board of this ship at New Orleans, where he had been to receive a thousand dollars of his mother's money, from her agents at that place. He got these funds, and was returning with them to her. In the course of the evening, and while playing a game of euchre, for pastime, with some of his acquaintances, a man came from one of the state rooms, having with him some gambling appliance, known to the fraternity as a "sweat cloth," and at once invited these young persons to leave their own game and he would "show them something more attractive," saying that he had been given a considerable sum of money to distribute among those who made good throws with the dice he exhibited. Almost simultaneously with this, another man, who is proved by the testimony to have been a confederate of the owner of the "sweat cloth," came from the same state room, and going up to young Smith, said : "Let us see him out." Smith and his challenger then went to the table upon which the "sweat cloth" was spread, and began playing by each putting down a dollar, and both losing. This continued until Smith, greatly excited, increased his stake to twenty dollars on each throw of the dice. The confederate of the gambler, meanwhile, had ceased to play. One of the companions of Smith, seeing how matters were going, tried to induce him to leave off, but the gamblers persuaded him to continue, upon the assurance that he could propably not only recover his losses, but make large gains. Under this stimulus their inexperienced

victim played deeper and deeper, until seven hundred and fifty dollars of his widowed mother's money was secured by the thieves. The exhibitor of the " sweat cloth" then coolly rolled up the gambling apparatus, and went with it and the stolen money into his state room.

The Manhattan did not arrive at Mobile until after 12 o'clock the next day (the 23th).

There is a conflict of testimony upon the question whether Captain Wilson was present, looking on, while the gamblers were fleecing young Smith. Whatever the truth is on this point, there is no dispute that the clerk of the boat was there the whole time, and witnessed the operation. The clerk, himself, admitted this on the trial, and it was testified to by a witness of unimpeachable veracity. It also appears, by the testimony of both the clerk and the captain, that the clerk informed Captain Wilson of the gambling affair, and the extent of young Smith's losses, immediately upon the occurrence of those events, but that no measures were taken to compel the gamblers to make restitution of their booty. It is further admitted by the captain and the clerk that the chief gambler was known to them both as a gamester, in the habit of traveling on the boat, and that on a former occasion the captain prevented him from pursuing his abominable vocation.

These facts are undisputed, and upon the case as made and the law applicable to it, I am called upon to adjudicate between the parties litigant.

An objection, *in limine*, is made to the jurisdiction of the court. It is contended, by the counsel for the respondent, that the remedy of the plaintiff is by an action in a court of common law jurisdiction, and that this case does not come within the definition of a marine tort, cognizable in admiralty. On the other hand, the counsel for the libellant insists that the jurisdiction of the admiralty courts of the United States is conferred by the constitution, and does not, as was argued, depend upon the regulations of commerce; that where an action on the case may be maintained according to the course of the common law, the admiralty court has also

jurisdiction, if the cause of action arose upon the high seas, or within the ebb and flow of the tide.

The authorities cited by the libellant's counsel appear to settle the question in favor of the jurisdiction of this court. I have not reached this conclusion without being obliged to overcome preconceived opinions tending to a contrary result. In a doubtful case I am anxious not to find jurisdiction, preferring to think that where it is not plainly granted, or to bo fairly implied, it is, for wise reasons, expressly withheld. But upon a careful examination of the cases cited, and the principles upon which admiralty jurisdiction is based, I am of opinion that the libellant and her cause of action are *coram judice.*

The test by which the jurisdiction of this court is ascertained in cases like the present is, the wrong complained of must be committed on the high seas, or within the ebb and flow of the tide, and be of such a description that an action of trespass on the case might be maintained for it in a court of common law jurisdiction. That great lawyer, Sir William Scott, said that an "injury done on the high seas is a fit matter for redress in a court of admiralty;" and Doctor Godolphin, whom Mr. Justice STORY quotes approvingly, and whom he describes (*Chamberlain* agt. *Chandler*, 3 *Mason's Reports*), as "a very learned admiralty judge," declares that "affairs relating to ship's officers or mariners, their office and duty, their offenses, whether by willfulness, casualty, ignorance, negligence or insufficiency, with their punishments," are proper subjects of admiralty jurisdiction.

If other and modern authority were needed on this point, it may be found in the case of *The Philadelphia, Wilmington and Baltimore Railroad Company* agt. *The Philadelphia and Havre de Grace Towboat Company, reported in* 23d *Howard's Supreme Court Reports.* Mr. Justice GRIER (*pp.* 214, 215) says : "The jurisdiction of courts of admiralty in matters of contract depends upon the nature and character of the contract; but in torts, it depends entirely upon locality. If the wrongs be committed on the high seas, or within the ebb and flow of the tide, it has never been disputed that

they come within the jurisdiction of that court. Nor is the definition of the term 'torts,' when used in reference to admiralty jurisdiction, confined to wrongs or injuries committed by direct force. It includes, also, wrongs suffered in consequence of the negligence or malfeasance of others, where the remedy at common law is by an action on the case."

Having disposed of the question of jurisdiction, I will now consider the case on its merits. It is a case of much interest and importance. It concerns all that portion of the community who travel by water, and involves a consideration of the character of ship masters, their powers, duties and responsibilities. I know of no more important relationship to society than that of the commander of a vessel engaged in the carriage of passengers. Chancellor KENT (*vol.* 3, *m.*, *p.* 159) says: "He ought to possess moral and intellectual as well as business qualifications of the first order." *Cleirac*, in his *Jugemens d' Oleron C. I.*, says that "the title of 'master of a ship' implies honor, experience and morals."

Volumes might be written in amplification of these tersely stated premises, without adding to their pith and aptness. They are, in effect, declarations of the maritime law; that no man of blunted moral sense, or of low intellectual range, or who does not possess a nice, delicate sense of honor, or whose experience of life is narrow and meagre, should be allowed to occupy the position of master of a ship. His authority at sea is of the most absolute character—amounting almost to sovereignty. He can exact unquestioning obedience from all on board, and make even his caprices the law of the voyage. Passengers and seamen are alike subject to his control. He may suitably punish a refusal of either to obey the reasonable regulations of the vessel, or for gross behavior while on board. If he is of opinion that the good order or safety of the ship requires it, he may invade the privacy of a state room, and exclude a passenger from the cabin. He "may refuse passage to persons whose characters are doubtful, or dissolute, or suspicious and *a fortiori*, whose characters are unequivocally bad." He has

the right to inquire into the intent with which a traveler seeks a passage, and "to act upon reasonable presumption in regard to him," as for instance : "If a known or suspected thief were to come on board," he would be authorized to presume his intention to be to carry out his criminal designs against the property of others, and not only may, but might refuse to convey him, or accept all the liabilities of carrying him (*Jencks* agt. *Coleman, Sumner's Reports, p.* 222). If then, he may refuse passage to persons of known bad character, if he have the right to say to a thief "I will not allow you on board of my ship," and if he should say and do this in regard to a notorious rogue, what should he do when he finds out that a common gambler, with the tools of his avocation for luggage, is among his passengers?

The enlightened judgment of mankind consents to stigmatize gambling as a most pernicious vice. Every Christian code denounces it as a crime, and punishes it as such. A common gambler is a common nuisance. Insensible to honor, deaf to pity, and bent upon plunder, he is a human cormorant, more detestable than the bird of prey itself; and if it is within the power, it is the clear duty of the managers and directors of public conveyances to save the traveling community from contact with them.

The extensive powers with which the master of a vessel is clothed, are not, however, to be used except in furtherance of the objects the laws have in view, and in every case responsibility runs parallel with privilege. The misuse of authority is the parent of accountableness, and it is a proposition of universal application in the affairs of civilized life that whenever the laws invest any person with an enlarged degree of power over his fellows, they impose a corresponding obligation, and watch with a jealous eye the exercise of discretionary authority. Hence it is that the duties of a master of a vessel are stated with great precision and clearness in the books. I need not consider here what his duties are to the owners of a ship or to the officers and crew of his command. None of these are involved in the case under consideration. "In respect to passengers," says Judge

STORY (*Chamberlain* agt. *Chandler*, 3 *Mason's Reports*), " the case of the master is one of peculiar responsibility and delicacy. Their contract with him is not for mere ship room and personal existence on board. It is a stipulation not for toleration merely, but for respectful treatment; for that decency of demeanor which constitutes the charm of social life; for that attention which mitigates evil without reluctance ; and that promptitude which administers aid to distress."

Towards women and minors, the master of a ship is bound at all times to exercise the care and tenderness of a *pater familias,* and this is especially his duty when they are unaccompanied by a natural guardian. The fact is that, in the eye of the law, he stands to all his passengers *in loco parentis.* They are entitled as matter of right, to his attention and protection. It is not to be tolerated that a person of immature years, or a female passenger, shall be beaten or robbed in the presence of the captain or one of his officers, and he not be held accountable in damages to the father or husband? And should it make any difference in his legal liability, that though not present at the perpetration of the crime, he takes no means to punish the assaulter, or make the thief disgorge, on being reliably informed of the commission of the offense? Does he not, in effect, consent to the outrage, if he does not use the means within his lawful reach, and promptly, so far as those means extend, to redress the grievance? Judge WARE, in *Plummer* agt. *Webb et al.* (*Ware's R.*), on this point, says : " He (the master) is intrusted by the law with the supreme power on board of his ship, and what is done by his permission must be conconsidered as done by his authority." And in the case before me, if a generous construction of Captain Wilson's omission takes from it any collusive aspect, can justice or law require less than liability for the results of his negligence? Shall he go free, if he make no attempt to discharge a plain duty, the performance of which might, and in all probability would have corrected the evil, while yet the wrong doer was legally subject to his control?

A decree will be entered that the libellant, Mary A. Smith, recover from the respondent, Joseph A. Wilson, the sum of seven hundred and fifty dollars, with lawful interest thereon from the 22d day of February, 1866, together with costs.