THE OHIO AND MISSISSIPPI RAILWAY CO. *v.* APPLE-
WHITE.

RAILROAD.—*Diligence of Passenger.*—It is the duty of a person about to
take passage on a railway train to inform himself when, where and how
he can go or stop, according to the regulations of the railway company;
and if he make a mistake, not induced by the company, against which
ordinary diligence would have protected him, he has no remedy for the
consequences against the company.

SAME.—*Refusal to Stop Train Contrary to Regulations.*—Where a person who
had purchased of a railroad company a ticket for passage to a certain sta-
tion, by his own fault or mistake, got upon a train which, by the regula-
tions of the company, did not stop at that station, he could not recover
damages of the company for the refusal and failure of the conductor to
stop the train and let him off at said station.

From the Washington Circuit Court.

*H. P. Buxton, E. C. Devore* and *C. A. Beecher,* for appel-
lant.

*B. H. Burrell,* for appellee.

DOWNEY, C. J.—Action by the appellee against the
appellant. It was commenced in Jackson county, and the
venue changed to Washington county.

The complaint alleges that on March 20th, 1873, appel-
lant received appellee on one of its passenger trains, to be
carried from Brownstown to North Vernon and back again
to Brownstown, for one dollar and fifty cents, which sum
appellee paid; that while appellee was a passenger, return-
ing to Brownstown, in a passenger car, and after he had
delivered his ticket to the conductor on said train, appellant
wilfully failed, neglected and refused to stop said train at
Brownstown a sufficient length of time to let him get off at
Brownstown, although requested so to do, but wrongfully,
wilfully and unlawfully carried him past said Brownstown
to Vincennes, a distance of ninety-six miles from his home
and place of destination, against his will, and there permit-
ted him to get off said cars, at a late hour in the night, in a
strange place, and among strangers, and, on account of the
gross neglect of appellant in the premises, compelled him to

pay hotel bill, one dollar and fifty cents, and three dollars and eighty cents fare from Vincennes to Brownstown, and caused him to lose one day's time and to stay up the greater part of the night, by reason of said wrongful and unlawful acts of appellant, to plaintiff's damage five hundred dollars.

A demurrer to this complaint was filed, which was over-ruled by the court.

The defendant answered by a general denial and four special paragraphs. The special paragraphs were, on motion of the plaintiff, struck out by the court.

There was a trial by jury, and a verdict for the plaintiff, on which, after overruling a motion of the defendant for a new trial, there was final judgment.

The appellee has moved to dismiss the appeal for various reasons, and among them for defects in the clerk's certificate to the transcript. Under a rule of the court, we have granted leave to have the certificate amended, and that objection has been avoided by making the necessary amendment. Other grounds of the motion relate to matters which are not reasons for dismissing the appeal.

Among the errors assigned by the appellant is, that the court erred in overruling the demurrer to the complaint. This alleged error is not argued or urged, and perhaps has no good foundation. The complaint seems to us to be sufficient.

It is assigned as error, that the court improperly struck out the second, third, fourth and fifth paragraphs of the answer. But neither is this objection urged. It could not be, in fact, for there is no bill of exceptions reserving the question.

Under the error assigned relating to the motion for a new trial several questions arise, only a part of which need be examined.

We give the evidence of the plaintiff and that of the conductor on behalf of the defendant. We do this as the readiest mode of getting into the opinion the most material facts

of the case.   There is other testimony in the record on each side.

Appellee testified: "On March 20th, 1873, W. Scott Wilkerson bought two tickets for passage on appellant's railroad from Brownstown to North Vernon and return — one for himself and one for me. We got on the mail train at Brownstown, at about 5:30 P. M., and arrived at North Vernon about 7 P. M., same evening. The conductor, as we went up, took up the portion of each ticket to North Vernon, and handed back the return portion. We got on the train at North Vernon, bound west, about 2 A. M., to return to Brownstown, and when the conductor, Fields, came for our tickets, Wilkerson handed him the return portion of our tickets. When he took them, he said, 'How do you expect to get to Brownstown?' Wilkerson replied, 'By the way of the O. & M.' That was all the conversation we had with him at that time. The next time I saw the conductor was at Medora, eight miles west of Brownstown. From the point where the conductor took up our tickets to Medora was about thirty-five miles. The train did not stop at Brownstown. Medora was the first place the train stopped after leaving Brownstown. When Mr. Wilkerson handed our tickets to the conductor, he seemed to be mad because we wanted him to stop at Brownstown. I judged so from the manner in which he asked the question, 'How do you expect to get to Brownstown?' At Medora the conductor said to me, 'You had better get off here.' I went to the door of the car and asked him, 'What place is this?' He then said, 'Medora.' I said to him, 'I guess I won't get off here.' He said, 'I will see if you don't.' I said, 'You can put us off, but we do not intend to get off.' The conductor did not seem to like it because we would not get off. When we said we would not get off, he said he would see if we did not get off at Scottville or Tunnelton. I did not get off at Medora. The fare from Brownstown to Medora is thirty-five or forty cents. We got to Medora about 3 o'clock A. M. The conductor did not propose to

send us back from Medora to Brownstown. There was no train standing on the switch at Medora that I saw. The train bound east passed us while we were there on the side-track. The conductor gave us no notice that there was a train at Medora on which we could return to Brownstown. He did not tell us when we could get back from Medora to Brownstown. I think the train did not stop again until we got to Mitchell. At Mitchell the conductor did not request us to get off, or inform us when we could get back. We did not ask him to let us off at any place. After we passed Mitchell, the conductor said, 'Well, boys, you can go as far as I do.' I answered, 'Well, that is as far as we want to go.' We continued on the train to Vincennes, which is ninety-five or one hundred miles west of Brownstown. In the conversation just after we passed Mitchell, the conductor asked us how we expected to get back. I said, we intended to come back with him. He replied, 'Well, if you do, you will have to pay your fare.' At or near Washington, he asked us if we were looking for a location. We said, 'Yes.' Something was then said about a 'free ride,' and that we might as well look at the country now as any time. This was the last conversation. We got off the train at Vincennes, and were compelled to remain there until 2 or 3 P. M., when we got on the mail train and paid our fare to Brownstown, which was three dollars and eighty cents each. We got breakfast and dinner at Vincennes, which cost us one dollar and fifty cents each. I saw Mr. Fields, the conductor, as we were leaving Vincennes, standing in the door of the Junction Hotel. He bowed to me and I to him. We arrived at Brownstown about 6 P. M., the same day. At that time I was acting deputy auditor of Jackson county. I lost one day. My time was worth two dollars. I was kept up the greater part of the night. I did not get on the train at North Vernon till 2 A. M. All the stations I have spoken of are on the Ohio and Mississippi Railway. I know R. H. Sawyer, appellant's agent at Brownstown. I never told him that the conductor told us to get off at Seymour. I never

told him, in the presence of R. J. C. Smith, that I had an arrangement with the superintendent to stop the train at Brownstown. Sometimes, before the 20th of March, I went to Seymour once or twice a week. I did not travel over appellant's railroad as often as once a week. I was conversant with mail train east and No. 3 west. I did not know that No. 4 east and No. 5 west did not stop at Brownstown. I got off the train at Seymour, and went into the Harvey House. The train remained at Seymour about five minutes. The train stopped at Medora four or five minutes. I made no effort to get off at Medora or Mitchell. Did not want to get off."

A. F. Field's deposition: "I was conductor on appellant's railroad March 20th, 1873. I know appellee and Wilkerson when I see them. They got on passenger express train No. 5, going west, about that time, at North Vernon. After leaving North Vernon I went to them for their fare. They were sitting in a seat together. They each handed me the return section of a round trip ticket from Brownstown to North Vernon and return. I told them that the train did not stop at Brownstown; that we had a meeting point to make at Medora, and would lose our meeting place if we stopped, and that Brownstown was not a stopping place for that train. I then offered them their tickets back, telling them to go on some other train from Seymour that stopped at Brownstown. They refused to take back their tickets— said they proposed to go to Brownstown on that train. The train stopped at Seymour about five minutes, it being a regular stop for that train. After leaving Seymour, I noticed that they were still on the train, but said nothing to them till after the train arrived at Medora, that being the meeting point for express train east and No. 5. There I requested them to get off, which they refused to do. They further said that I dare not put them off. The train proceeded, and stopped at Mitchell, Shoals, Loogootee, Washington, Wheatland, and Vincennes, at which point my control of the train ceased, and I got off, and they got off also.

We arrived at Vincennes at 6:30 A. M. We stopped at Medora about seven minutes, at Mitchell about five minutes, at Shoals, Loogootee and Wheatland about one minute each, and at Washington about three minutes. The points named were regular stopping places for said train, and at those places there were regular platforms and conveniences for safely getting off and on trains. We arrived at Seymour at about 2:30 A. M. If they had got off at Seymour, they could have taken a freight accommodation, which left at about 4 A. M., and got to Brownstown about 4:40 A. M., and which stopped at both points. They made no request to stop at any point between Seymour and Vincennes, and they paid no fare, and did not offer to pay any, between Brownstown and Vincennes, and I did not ask any. They seemed to be under the influence of liquor, and inclined to be drowsy and sleepy, but were not boisterous. No. 5, being an express train, had but one regular stop between Seymour and Mitchell, a distance of forty miles, that point being Medora, the meeting point for the express train bound east. Brownstown was not a usual stopping place for No. 5, and the company did not profess to leave or receive passengers there on that train. There were two other passenger trains at that time which stopped at Brownstown and North Vernon—No. 1 and No. 3. Two passenger trains stopped there going east, and two going west, daily. No. 5 was the only one that did not stop there going west. It did not stop at Brownstown because it was a night express and was mostly for through business. Brownstown was not a stopping place for that train on the time card, and never had been, if I recollect correctly. I have seen appellee and Wilkerson on the trains frequently, principally between Brownstown and Seymour."

The appellee testified in rebutting as follows:

"I know R. H. Sawyer and R. J. C. Smith. I heard Sawyer's statement while on the witness stand. I have no recollection of having any such conversation with Saw-

yer before I bought the ticket, as detailed by him. I have no recollection of having any such conversation with him afterwards, as detailed by him. Did not have such conversation with Fields as stated in his deposition. We were not under the influence of liquor at the time we got on the train at North Vernon. Defendant don't take passenger tickets on freight trains. Have seen the conductor refuse them. I have no recollection of Sawyer ever having notified me that No. 5 did not stop at Brownstown."

We think it apparent from the evidence that the appellee was in fault in going upon a train to return to Brownstown, which he knew, or by reasonable diligence might have known, did not stop at that place.

The fact that the appellee and his companion succeeded in getting their return tickets into the hands of the conductor, and then, after he found where they wished to be put off, refused to take them back from him, adds nothing to the merits of the appellee's case.

We think the theory, in point of law, on which the case was tried, was a wrong one. It is the duty of a party going upon a railroad train to inform himself when, where, and how he can go or stop according to the regulations of the railroad company, and if he make a mistake, not induced by the company, and against which ordinary diligence and care would have protected him, he has no remedy for the consequences against the company. *The Pittsburgh, etc., R. W. Co.* v. *Nuzum*, 50 Ind. 141, and cases cited; *Dietrich* v. *Pennsylvania R. R. Co.*, 71 Pa. St. 436; *Chicago, etc., R. R. Co.* v. *Randolph*, 53 Ill. 510.

The judgment is reversed, with costs, and the cause remanded, with instructions to grant a new trial.

Petition for a rehearing overruled.