CINCINNATI, HAMILTON AND DAYTON RAILROAD COMPANY *v.* WILLIAM C. COLE.

1. Railroad companies incorporated prior to the adoption of the constitution of 1851, and which avail themselves of the *twenty-fourth* section of the general corporation act of 1852 (S. & C. Stat. 281), either by taking leases of the roads of other companies, or by leasing their own roads to other companies, are to be regarded as thereby accepting a "provision" of said act, within the meaning of its *seventy-first* section, and relinquishing all rights under their charters inconsistent with the provisions of said act.

2. The right to demand and take specified rates of fare, free from legislative control or alteration, is one of the rights thus relinquished by such companies, and they, therefore, become subject to legislative control, in that regard, equally as companies formed under said act of 1852.

3. In order to work such relinquishment or repeal of its chartered rights

C., H. & D. R. R. Co. v. Cole.

inconsistent with said act, it is not indispensible that a certificate of the company's acceptance should be filed with the secretary of state. It is the *fact* of acceptance that binds the company. The certificate is merely *evidence* of the fact, and the company cannot profit by its failure to file the certificate.

4. In an action by a passenger against a railroad company for being wrongfully ejected from the cars by the conductor, it appeared that the rates of fare fixed by the company, and which by its established rules it was made the duty of the conductor to demand, were higher than those allowed by law. The plaintiff tendered what he claimed to be, and what was ultimately held to be the legal rates, and, upon refusal to pay more, was ejected from the cars, but without any rudeness or unnecessary violence. It also appeared that the plaintiff, at the time he took passage, knew the established rates, and expected to be ejected from the cars, intending to bring an action for such ejection, in order to test the right of the company to charge the established rates.

*Held:* That the plaintiff was only entitled to compensatory damages, and that it was competent for the company, for the purpose of mitigating damages, or preventing the recovery of exemplary damages, to give in evidence subsequent declarations of the plaintiff, tending to prove that his object in taking passage on the cars was to make money, by bringing suits against the company for demanding or receiving their established rates of fare.

ERROR to the Common pleas of Allen county.

This was an action brought by Cole against the plaintiff in error for wrongfully ejecting him from one of its cars, on which he was a passenger, and also to recover the statutory penalties for demanding rates of fare exceeding *three cents* per mile, as prescribed by the act of April 25, 1873 (70 Ohio L. 161). The essential facts disclosed by the record, and which are necessary to an understanding of the questions involved, are these: In 1869, the plaintiff in error became the lessee of the Dayton and Michigan Railroad, and it has ever since used and operated the same in connection with its own road, the two forming a continuous line. Both companies were chartered prior to the adoption of the present state constitution, and both were authorized by their respective charters to charge and receive rates of fare " not exceeding *three and one-half cents* per mile " for passengers. The rates of fare established by the

plaintiff in error, and which its conductors and ticket agents were required to demand from passengers, exceeded *three* cents per mile, but were less than *three and a half* cents per mile. Cole was a passenger over part of the Dayton and Michigan Road. He demanded of the proper station agent a ticket for the distance which he wished to travel, and tendered to the agent *three* cents per mile therefor. This the agent refused to receive, demanding the rate established by the company. Cole took passage without any ticket, and, upon being called on by the conductor for his fare, tendered the conductor three cents per mile to the place of his destination. This the conductor refused to receive, and, Cole refusing to pay the established rate, he was ejected from the car, but without any rudeness or unnecessary violence.

A bill of exceptions taken on the trial shows that Cole, before he demanded his ticket, knew what rates of fare were established by the company; that he went on the car knowing that it would be the duty of the conductor to eject him unless he paid the established rates, and with the intention to test the question by action at law, whether the company could lawfully charge more than three cents per mile.

It also appears from the bill of exceptions that on the trial of the case, in order to mitigate damages or to show that Cole was not entitled to recover exemplary damages, the company offered to prove that Cole had, shortly after his said ejection from the cars, caused the following publication to be inserted in the Van Wert *Bulletin:*

"ABOUT RAILROAD FARES.

"*Editor Bulletin:*—Five hundred dollars can be made by any one who will get into a railroad car that is carrying passengers in this state, and where they are charging over three cents per mile for the same, and pay their fare from station to station, making the distance over eight miles. The railroads of this state have been swindling not only the rich,

but the poor, ever since last April, and it is time that a stop be put to it.

"Any one who will take the trouble to walk into a lawyer's office and ask for the statutes of 1873 will find, on page 161, that every time that any railroad in this state demands or *receives* over three cents a mile for carrying passengers a distance of over eight miles, they shall forfeit and pay to said passenger not less than twenty-five dollars. The law is couched in such plain and simple language that it requires no lawyer to expound it to the dullest comprehension. The only way to make the railroads abate this nuisance is to reach their pockets ; and, if enough of the people will get into their cars and ride a few days, they will not only make money faster than ever they did before, but they will also bring the railroads to their senses, and

> " ' Spoil the spoiler as we may,
> And from the robber rend the prey.'

"W. C. COLE."

This evidence was objected to by Cole, and excluded by the court, and the company took exception.

After the evidence had closed, counsel for the company asked the court to instruct the jury that the company are not bound by the act of April 25, 1873, fixing three cents per mile as the maximum rate of fare. This request the court refused, and charged the jury to the effect that the act was binding on the company, and that no more than three cents per mile could be lawfully charged by it for passenger fare.

Counsel for the company also asked the court to charge the jury : " That if plaintiff is entitled to recover at all for the ejection, he having been given an opportunity to pay the fare demanded, and defendant acting without malice, he can only recover compensatory damages—that is, the amount of fare which he would have been required to pay between Roachtown and Toledo." Which instruction the court refused to give, and, on the contrary, instructed the jury, among other things, that the plaintiff was entitled to

recover for the injury to his *feelings* caused by a *public* expulsion from the cars."

The jury having found a verdict for Cole, and assessed his damages at $3,575, and the company having moved for a new trial on the ground that the verdict was contrary to the law and the evidence, it was ordered by the court that a new trial should be granted unless Cole would remit from the verdict the sum of $2,500. This *remittitur* was entered, and judgment was thereupon rendered against the defendant for the remaining sum of $1,075.

It is now sought to reverse this judgment on grounds which are sufficiently stated in the opinion of the court.

*James Murray*, for plaintiff in error :

I. The charters of both the Cincinnati, Hamilton and Dayton and the Dayton and Michigan Railroad Companies contain the same provision as to the rate of fare allowed to be charged for the transportation of passengers—to wit, not exceeding three and one-half cents per mile for any distance exceeding thirty miles, etc.

In the case at bar the distance was to exceed thirty miles, and the rate of fare demanded *did not* exceed three and one-half cents per mile.

*No change* of or amendment to either of these charters has ever been made since the adoption of the present constitution.

Prior to that time the charter of a corporation constituted (in the absence of authority therein. conferred so to do) an irrepealable and unchangeable contract between the state and the corporation, unless both parties consented thereto. *Smith* v. *P. Ft. W. & C. R. R. Co.*, 23 Ohio St. 10 ; *Thrope* v. *R. & B. R. R. Co.*, 27 Vt. 140 ; Redfield on Railways, 23 ; *State* v. *Boston, etc., Co.*, 25 Vt. 442 ; *Whiting* v. *S. & Fon du Lac Co.*, 25 Wis. 167.

II. In the present case, the alleged lease (for, speaking in strictly legal phraseology, it is not a lease, being for a period of time *not less* than a freehold, but for a freehold,

to wit, "*forever*," and therefore only a contract,) does not affect the franchise of either company.

The organization of the Dayton and Michigan Railroad Company remains *intact*. It has not been merged into or become part of the Cincinnati, Hamilton and Dayton Railroad Company's road. It has the very same powers, rights, and privileges as a separate and distinct corporation that it ever had, and is subject to the same liabilities and obligations that it ever was. It has its own distinctive officers, books, employes, offices, agents, and machinery. It runs its own road. True, it may be run by the *same persons* who are *also* officers of the Cincinnati, Hamilton and Dayton Railroad Company, but they run it as officers of the Dayton and Michigan Railroad Company, *eo nomine*, and not as officers of the Cincinnati, Hamilton and Dayton Railroad Company.

Section 71 of the act of May 1, 1852 (Wright, 47), provides how *old* companies may come in and accept the provisions of that act as *to any one* or all of the provisions thereof *which are inconsistent with the provisions of their charter*, and that is by filing a certified copy of their acceptance with the secretary of state.

Certainly, then, if this provision as to a lease was inconsistent with our charter (which it was not), and by filing our acceptance with the secretary of state we could have availed ourselves of that clause without in the slightest degree affecting the remainder of our chartered rights, we could incur no greater degree of responsibility or liability in accepting it by parol. If it was a lease, it was *not* in anything *inconsistent* with our chartered rights, privileges, or responsibilities.

III. The act of April 25, 1873, does not upon its face appear to be intended to apply to companies incorporated prior to the adoption of the present constitution.

Its object is expressed in its title, as the constitution requires, and that is amendatory to the act *for* the creation, etc., of incorporated companies. If, then, the amendment proposes, as a matter of right, to *go back* of the time when

incorporated companies could have been created under the act of May 1, 1852, then it is going beyond what the original act purported as a matter of right to do, and would be in clear violation of the constitution. We must, under every well-settled rule of construction, apply the words of an amendatory act to the object sought to be accomplished by the original act, and that was the creation and regulation of corporations *under* that act. It neither sought to nor did it have any application to corporations theretofore created and existing by special charter under the old constitution. The court will not presume, in the absence of express words to that effect, that the amendment was intended to include and cover more than the act, and as the words " or any corporation operating a railroad in whole or in part in this state" may very well and properly be presumed to apply to that class of corporations *alone* included in and covered by the act of May 1, 1852, the court are not at liberty to give it any more extended construction, and therefore we may well conclude there was no such legislative intent.

IV. The letter admitted to have been written and published by the plaintiff below in the Van Wert *Bulletin* was by the court below improperly refused to be admitted in evidence.

It seems to us that, taken in connection with the admitted fact that this man when he got upon the train knew that the company charged, and claimed under their charter and the law the right to charge, a greater rate of fare than three cents per mile, and that he would be ejected if he refused to pay at more than that rate, it was admissible as tending to show the *animus* of plaintiff, and competent as tending to show his object in taking passage on the train at the time and in the manner which he did.

It is true the letter was written and published subsequent to the grievance complained of, but it is also true that, taken in connection with his former acts and declarations, it might well go to the jury to be weighed by them in their determination as to the measure of

damages (if any) which this man might be entitled to recover.

*Cunningham & Brotherton,* and *H. C. Glenn,* for defendant in error.

WELCH, C. J.   The important question in the case, and that, doubtless, for the decision of which it was brought here, is whether either of these companies is bound by the provisions of the act of 1873, fixing their maximum rates of fare below what they are allowed by their charters to take.  If both companies are bound by that act, it is needless to consider one of the principal questions argued by counsel, namely, whether by virtue of the lease the lessee company acquired the franchise of the lessor company to demand and receive toll; or whether, on the other hand, the lessee company is to be regarded as deriving that franchise directly from the state.   We all unite in the opinion that *both companies are* bound by the provisions of the act.   We are of this opinion, not because we do not regard the charters of the companies as being in the nature of contracts between the companies and the state, but because by the execution of the lease both companies have virtually relinquished their right to charge the rates of fare specified in their charters, and submitted to be regulated in this respect as companies formed under the present constitution. The act of 1873 in terms applies to all railroad companies operating roads within the state, as well those organized before as those organized since the date of the present constitution.   In other words, if at the date of the act there was legislative power to change the rates of fare chargeable by these companies, the power has been exercised.   We think there was such power.   The general corporation act of 1852 (S. & C. 281, sec. 24) authorizes " any railroad company organized in pursuance of law " to " lease or purchase any part or all of any railroad constructed by any other company," in cases where the roads are connected or continuous, as in the present case.   And section 71, of the

same act provides: " That all companies now incorporated within this state, and actually doing business, may accept *any* of the provisions of this act, and when so accepted, and a certified copy of their acceptance filed with the secretary of state, that portion of their charters inconsistent with the provisions of this act is hereby repealed."

It can not be denied that by the execution of the lease in question these companies did avail themselves of and thus *in fact* " accept " a material " provision " in the act. True, it does not appear that any " certificate " of this acceptance was filed with the secretary of state; but we think it is not for the companies, thus availing themselves of the benefit of the provision, to profit by their own omission to file the certificate. If either party has a right to object on that account, it is the state and not the companies. It is the *fact* of acceptance that binds the company, and the certificate is merely evidence of the fact. We, therefore, see no error in the court's charge touching the rate of fare.

But we are of opinion the court erred in excluding the publication offered in evidence. It tended to show the *quo animo* of the plaintiff, and that the case was not one in which he should recover damages for supposed injury to his " feelings." It tended to show that he entered the car expecting to be ejected, as he was ejected, and for the purpose of making money out of the transaction. So far as injury to " feelings " is concerned, it tended to show that it was a fair case for the application of the maxim that to the willing mind there is no injury. The expulsion was one which he sought and expected. The question of the lawfulness of the fare could have been raised and settled as well without the expulsion as with it.

We think also that the verdict was grossly excessive, and that it can only be accounted for on the theory of prejudice, or of an entire misconception of the rule of damages in such cases. The verdict should have been set aside, and a new trial granted.

*Judgment reversed, and cause remanded for a new trial.*