HALL *v.* MEMPHIS & CHARLESTON R. Co.

*(Circuit Court, W. D. Tennessee.   October 2, 1882.)*

1. ACTIONS IN TORT AND EX CONTRACTU—TENN. CODE, § 2746 ET SEQ.

    The plaintiff, on the facts stated and proven may, in Tennessee, recover whatever damages he may be entitled to, whether his action sounds in tort or *ex contractu*, all forms of action having been abolished by the Code.

2. CARRIER OF PASSENGERS—LIMITED TICKET—EJECTION—MEASURE OF DAMAGES.

    A passenger holding a ticket, the limitation of which has expired, cannot insist that the conductor shall take it, in violation of a regulation of the company requiring the conductor to demand train fare of persons without tickets, although he may have an understanding or contract with the station agent of whom the ticket was purchased that it would be received after the time limited on the face of it ; and on the refusal to pay the fare ejection from the train was not wrongful. And the measure of damages in a suit for a breach of the alleged contract is, in the absence of proof of any special damage by delay, only the price of the extra fare demanded and paid for transportation to the place of destination.

3. SAME—WRONGFUL EJECTION—RESISTANCE BY PASSENGER.

    While resistance to the authority of a conductor does not preclude a passenger from recovering reasonable damages for a wrongful ejection from the train, it is his duty, certainly where he is in the wrong, to submit without resistance, except in defense against impending bodily injury ; and, right or wrong, unnecessary resistance will excuse the use of force and mitigate the damages for any injury received.

4. SAME—CONTRACT OF CARRIAGE—MISTAKES ABOUT TICKETS.

A contract of carriage is made with reference to the reasonable regulations of the carrier for the intercommunication between the agents of the carrier in the transaction of its business; and mistakes should be treated, as in other business transactions, as matters for adjustment between the passenger and the proper agents of the carrier. *Held*, therefore, that where there is a dispute arising on the train about the ticket it is the duty of the passenger, if able to do so, to pay the extra fare and rely on his remedy to recover it back, rather than to force the conductor to expel him, with a view to suing for damages for a wrongful ejection. And, if he insists on expulsion, he can recover no other damages than he could have recovered if he had paid the extra fare or quietly left the train and sued for a breach of the contract.

5. SAME—PLACE OF EXPULSION—REGULAR STATION.

A regular station is not an improper place to eject a passenger, although there may not be a hotel for public accommodation at that place.

Motion for New Trial.

The plaintiff, who is about 85 years of age, purchased tickets at reduced rates for himself, his wife, about 76 years of age, and his daughter and her child, from Town Creek, a station on defendant's road, to Memphis and return, upon which a limitation was printed, "Not good after 30 days." They were persons of the highest respectability. Going to Texas, they returned after the limitation expired, and the conductor refused to receive the tickets, demanding train fare. This being refused, they were ejected at the next station, as required by a regulation requiring the conductor to demand certain prescribed rates for passengers not holding tickets. The plaintiff insisted that he had purchased the tickets as unlimited tickets, and that the station agent had assured him that, notwithstanding the limitation, he could be carried on them at any time. This was denied by the agent, and there was great conflict of proof on the subject of what transpired at the time of the purchase. The plaintiff offered to pay the difference between the price of the tickets and the regular unlimited tickets, and between the price of the tickets and the train fare, which was refused. He then offered to pay this difference to Collierville, a station further on, where he had friends. This was refused, and he was advised by the conductor to pay train fare to that station. He told the conductor that he would only leave by force, and laying hold of the seat refused to leave it. The conductor forced him out of it, and led or dragged him from the train, and the others were conducted to the platform. There was no hotel there, but a small station-house, in which there was a room in which the parties passed the night, under circumstances of great discomfort. His wrist was somewhat strained, and his wife strained her ankle on the platform.

There was much dispute as to the exact occurrences, the inadequacy of light furnished, and assistance to the platform; the plaintiff complaining that they were hurried off and left in the dark, to find their way as best they could, in unpleasantly damp and cool weather for people of their age, while the conductor insisted that he acted with all the courtesy and gentleness possible under the circumstances, and with more attention than usual in like cases, because of the age of the parties.

It was not disputed that the business was disagreeable to the conductor, and that he was at much pains to persuade the plaintiff and other parties to pay the small sum demanded for fare to Collierville, at least, but that the plaintiff insisted on being put off with force unless his offers to pay only the difference between the price of the expired tickets and the train fare were complied with. The train fare to Collierville for the whole party was between three and four dollars. The plaintiff had ample means to pay train fare to either Collierville or Town Creek. The court directed a verdict for the defendant company, with a stipulation, however, to submit to a verdict for the extra fare paid by the plaintiff on the next day for tickets to his destination, if the court should conclude the company was liable for it. Subsequently a verdict was entered for the plaintiff according to the stipulation, and he moved for a new trial.

*Wright & Folkes*, for plaintiff.

*Humes & Poston*, for defendant.

HAMMOND, J. It was much argued at the trial and on this motion for a new trial whether, under this declaration, there could be any recovery *ex contractu* at all, and whether the action did not sound so entirely in damages that the plaintiff could not recover for any mere breach of the contract, irrespective of the question whether the plaintiff had been rightfully or wrongfully ejected from the train. The court was of opinion then, and now is, that this was an immaterial question, since, under our Code, abolishing all forms of action, a plaintiff may recover by a simple statement of the facts, be they what they may, if these facts entitle him to recover in any form. Tenn. Code, §§ 2746–2748, 2896, 2975; *Jerman* v. *Stewart*, 12 FED. REP. 266, 267; *Angus* v. *Dickinson*, Meigs, 459; 5 Am. Law Rev. 205, 225. The court, therefore, put the defendant under a stipulation to submit to a verdict for the price of the tickets, not because the ejection of the plaintiff was adjudged wrongful, but because the facts showed that the defendant had refused to carry out its contract, and

had incurred whatever liability attached for that breach.  A verdict and judgment were subsequently directed, under the stipulation, for the plaintiff for the amount he paid for the tickets, which settled the right to recover on the facts, but limited the measure of damages to the price of the tickets.   This action of the court assumed that the jury would have found the much-disputed facts in regard to the contract in favor of the plaintiff, and proceeded on the theory that he was entitled to be carried on the expired tickets from Town Creek to Memphis and back, and that the defendant company was guilty of a breach of its contract and liable for refusing to carry him.  The case was treated as if the plaintiff had paid the extra fair demanded, as he did the next day, when he purchased new tickets and proceeded on his journey, and then sued for a refusal to carry him on the original contract.

It is now argued that, this being so, the plaintiff was wrongfully ejected, and the case should have gone to the jury under proper instructions as to the measure of damages.  If the defendant company were complaining and demanding a new trial, I should not refuse it; for, clearly, the fact whether it made any contract other than that expressed on the limited tickets was much disputed, and the jury might have found the verdict either way, and the action of the court was wrongful as to the defendant company in depriving it of a jury trial on that question.  But the stipulation was put upon the defendant to compel it to submit to a verdict on that question against itself, and disembarrass the case of all other considerations, except the one whether the plaintiff was entitled to recover for putting him off the train anything more than the price of the tickets.   The proper direction would have been to find for the plaintiff the amount paid for the new tickets and interest, or not, in the discretion of the jury, instead of a direction to find for the defendant company.   But I had not then fully made up my mind that the plaintiff was entitled to recover anything *ex contractu*, and sought to reserve that question by the stipulation.  The real question in the case is one of the proper measure of damages.  When the court directed a verdict for the defendant corporation, with the stipulation above mentioned, it determined that the price of the extra tickets was the proper measure of damages, and, taking the subsequent action of the court under the stipulation into view, the case stands in the attitude of a direction by the court, on all the facts, assuming conclusively in favor of the plaintiff that he had a contract entitling him to carriage, that the

jury should find a verdict for the plaintiff for the price of the extra tickets, and he is entitled to a new trial if under any proper view of the facts or law he could have recovered more.

It is proper to remark that the court laid out of the case all questions of unnecessary force, for, on the plaintiff's own proof, and paying no attention to the conflict as to what was actually done, as appears by defendant's proof, he resisted the conductor, and not only provoked, but invited, force to eject him; no doubt under the mistaken view of the law, as he himself expressed it, that "he had a right to vindicate his constitutional and legal rights as a free American citizen;" that it was his duty to do so; and further, that resistance was necessary to secure his right of action against the company. He admits that much, and I do not doubt he felt that he was building up a more substantial claim for large damages by resistance. It is a common mistake, but where the conductor is acting lawfully, and doing what he has a right to do, the passenger must submit to his authority, and resistance is wholly unlawful. The courts will not, where a passenger is in the wrong, tolerate any nice discriminations about the force necessary to secure submission to the conductor's lawful authority and overcome the resistance, unless it may be where the conductor departs from the exercise of lawful force, and beats, wounds, or maltreats the resisting passenger in the ill-temper of belligerency, and thereby becomes an aggressor on his own personal account. Even here it would be remembered that the conductor is likewise human; while he should do his duty without unnecessary violence, and in the best of temper, a resisting passenger cannot expect the courts to erect delicate scales on which to weigh with exact nicety the force used to overcome his resistance. The conductor is somewhat like the master of a ship. He has police powers and disciplinary control over the train, and the quiet and comfort of the passengers and their safety are under his protection. He should be obeyed by the passengers, and the common notion that force must be invited to secure legal demands against his unlawful exactions is, in my judgment, erroneous and vicious. All the passenger need do is to express his dissent to the demand made upon him, and he need not require force to be exerted to secure his rights, certainly not to increase his damages. I have held in another case that even where the passenger is right and the conductor wrong, it is contributory negligence to resist him by engaging in an unnecessary trial of strength with superior force. Absolute submission may not be a duty where the conduct of the conductor is wrongful, and resistance does not pre-

clude the right to recover all reasonable damages for the wrong done; but unreasonable resistance should be considered in mitigation of damages; resistance should not, at all events, be allowed to aggravate the damages. *Brown* v. *Memphis & C. R. Co.* 7 FED. REP. 51, 65.

I fully recognize the feeling of "a free American citizen" in the face of threatened wrong or insult, but the safety of the ship forbids that he should fight with the master, and imperil the ship and the lives and property she carries. Better that he should suffer the wrong than to endanger or discomfort his fellow-passengers. The conductor of a railroad train is not altogether as supreme, perhaps, as the master of a ship; but on analogous principles, that seem to me obvious, it is, I think, the duty of a passenger to avoid resistance beyond mere dissent, and submit to his authority without more than mere protest, unless resistance is necessary to defend himself against impending personal injury. In this case, therefore, it not appearing that the conductor was guilty of any attempted violence in overcoming the resistance of the plaintiff, and that he was as considerate of his age and obstinacy as possible, taking all the plaintiff said to be true, I do not feel authorized on the proof to submit to the jury whether or not the plaintiff's resistance might not have been overcome with something less of force than the conductor used. The plaintiff said he did the best he could to retain his seat in the train by holding on and refusing to leave it.

The same considerations, growing out of the mistaken notion of the plaintiff that he was only vindicating his rights, that to do this he must invite force, and his obstinacy in refusing to pay the additional fare demanded while he had abundance of money with him to do so, convinced me that he was intent on making a case against this railroad company by compelling the conductor to eject him or recognize his tickets, and induced me to withdraw all the circumstances connected with his ejection from the consideration of the jury in aggravation of damages. In my judgment passengers cannot be allowed to build up cases for damages. Admit that the company should have carried this plaintiff notwithstanding the expiration of the limited ticket, and notwithstanding the regulations forbidding the conductor to recognize a ticket after it had expired, and it does not follow that the plaintiff is entitled to recover damages for the injuries, real or imaginary, to his person or his feelings for his *ejection* from the train. He may be entitled to the damages for a breach of the contract, which he has, by the judgment, received; and if, by the delay or refusal to carry him, he had suffered in his

business or been put to expense, these might have been added. But there was no proof of such damages in this case. It was claimed that damages should be awarded for indignity to these old people; for injury to them in their persons and feelings by putting them out in the night under circumstances of discomfort. The conductor should probably have carried these aged people, their daughter and child, to Collierville, some 15 miles further on, where they were willing to stop, and had ample time to adjust their trouble about the tickets. This, in consideration of their extreme age, and the great indulgence due to even the exactions, the whims, and the obduracy sometimes found in extreme old age, and abundantly manifested by this —as the proof shows—very excellent gentleman. All the jury, no doubt, would have advised this, and all the learned counsel, particularly those of the defendant. But this is mere sentimentalism. The conductor was not bound to do it, nor to risk expulsion by doing it, and the conduct of the plaintiff was not of that character to incline him to it. Here was an aged gentleman with an aged wife, their daughter and her child, found upon a train with expired tickets, which the conductor was forbidden to receive. There was a dispute about the obligation of the company to receive them. The fact appeared on their face that the contract of the company had expired, and 'this was all the conductor knew, or could know of his own knowledge. All else about them he must take from the plaintiff.

The plaintiff's claim rested upon complicated transactions, understandings, inferences, and a contract, if you please, resting in parol, with two or more station agents, more than 100 miles away. How could the conductor act on such a contract? How could he take these expired tickets, and obey the rules of his company prescribed for his guidance? But here was the plaintiff insisting unreasonably that he should. Their negotiations came to the point that by paying less than five dollars the party would be carried to Colliersville, where they had friends and were willing to stop until the trouble could be arranged; and yet this obdurate passenger refused to pay it, with ample funds in hand, and insisted on a forcible ejection of himself and the aged wife, their daughter and her child. If wrongly demanded it could have been recovered back, with costs, and all damages satisfied. Why should he not have taken that course? It is not the case of a man with a clear right and a clean ticket entitled to ride on that trip and train wrongfully ejected, but of one with a disputed right, a ticket void on its face, and which required further attention from the passenger to make it available, as he was informed

then and there by the conductor. Under such circumstances, to insist on the conductor taking his word about what he had been told by the station agents as to the capacity of the ticket to take him along after its plain terms had stamped it with uselessness, rather than pay the fare demanded, was his own folly; and this was the cause of his ejection and his damage, and it was not the proximate or remote result of a breach of the contract.

Here we are met with an argument that this was all for the jury and not the court. I think not. The court determines the measure of damages as a question of law, by fixing the principle by which the jury measures the quantity. Outside of that it is for the court to adjudicate on the facts as found by the jury, and in reaching my conclusions I assume all the plaintiff's case to be just as he himself makes it, and base my judgment solely on his proof. Numerous cases can be cited in opposition to these views, but none of them are from the supreme court, and I prefer to follow those that may be cited to support this judgment. The fact is that this class of cases is not satisfactory as furnishing precedents for any judgment. The facts are so differential, the oscillation and vacillation so great, that any hope of reconciling the conflict is visionary. The most that can be done is to trace out some principle of judgment that meets the general approval. That which I seek to follow here is this: While the law holds carriers to a rigid responsibility to the public, and will enforce it by awarding damages, sometimes more than have been actually sustained, it does not require of them unreasonable acquiescence in every demand made by a customer to waive their ordinary business rules of conduct in favor of his convenience or even in favor of his contract. I tried to illustrate this at the trial by putting the case of a passenger being furnished through accident or mistake with a ticket to another place than that to which he wished to go. He has paid his money and there is a valid contract to carry him to his destination, but it can hardly be that he can require the conductor to stop the train till he can rectify the mistake, or take the ticket on his assurance of the real contract, or to abandon the ticket system and disregard the regulations made for the general public and the carrier's mutual convenience. What is to be done? Clearly, it seems to me, the passenger should pay his fare—if able—and settle the difference with the company by returning the ticket and adjusting the balance. Men do this in ordinary business intercourse in other branches of trade or commerce, and there is no reason why they should not in this.

The law recognizes that these carriers find it necessary in their business to have their checks and balances in the intercommunication of their agents, and they require in its conduct elaborate systems of rules to prevent loss to them and to the public. Mistakes will occur with railroads as with others, and the same rules should be applied. It seems to me that a passenger, finding himself without a ticket or other evidence of his contract which will be recognized under these regulations, cannot plant himself on his contract right and force the railroad, outside and against the regulations, to a specific performance then and there by compelling the conductor to eject him as a foundation for more damages than he would receive if he should comply with the regulations, and sue for a breach of the contract. There is no other just way to manage these mistakes. Those who would defraud the company might pretend to be the victims of mistakes or the beneficiaries of contracts outside the regulations. We took much time, examined many witnesses, and heard much argument on the issue whether the station agent did or did not make the alleged contract to carry the plaintiff on tickets expired on their face, and I doubt if, in the conflict of proof, the jury could have reached a satisfactory verdict on that issue. How, then, could the conductor have tried it successfully in the brief time allowed him in collecting tickets? It was impossible. He had either to take the plaintiff's word for it or enforce his regulations. The plaintiff's word was, and has been all along, disputed; and, giving him the benefit of all the credence his character and life entitles him to, the fact remains that the conductor had no means of knowing the weight to be attached to his word, and a common impostor could have told the story as well as the best of men.

It is in my judgment the duty of a passenger to see to it, before he takes a train, that his ticket will carry him on that train, and where it is on its face expired he should have it renewed or otherwise made good at the proper place, and by inquiry before taking the train be sure that it is a proper thing for him to take that train. The business could not be done with tickets on any other principle. Admit all that may be demanded by a theory that it is the duty of the carrier to inform its agents of anomalous contracts and the result is the same. They do this by giving the passenger evidences of his contract, called tickets, or sometimes special passes, and it is likewise the duty of the passenger to see that he has these necessary tokens of his right to travel on a train. If there be mutual mistake

and mutual neglect, or even a mistake by the carrier alone, it does not follow that the passenger can demand that all the regulations shall be set aside to cure the mistake, but only that it must be by conference with the proper officers (and the conductor on a moving train is not in a case like this one of these) adjusted, and if this be refused, proper damages may be recovered. But the proper damages are not such as the unfortunate passenger may receive by absolutely insisting on a violation of the ordinary regulations, by subordinate officials for whose guidance the regulations are a necessity, to cover a case clearly outside of them. If the plaintiff had been penniless, I need not say whether the principle would be changed. Perhaps not. But here there was money sufficient to have paid the extra fare, as it was afterwards paid, and the plaintiff's duty was to have paid it that night and sue for a breach of his alleged contract, and not to force an ejection and lay the foundation for larger damages than a suit on the contract would have given him. Suppose he had continuously refused to pay further fare and remained continuously at the place where he was ejected, can it be said he could have recovered for all that delay in reaching his destination? Why, then, should he not pay at once and go on, as to pay later and go on, to avoid contributory negligence? It is argued that petty suits like that suggested by the court would be expensive and useless as a means of compelling great corporations to discharge their contracts, and the lawyers would not take them. Great corporations are no more liable for great damages for small injuries than other people, and the plaintiff, before a justice of the peace at his own home where the witnesses all resided, by an ordinary suit, could have recovered back all the extra fare, if he were entitled to it, with as little expense as in other cases.

Some argument has been made that the conductor demanded more fare than under the regulations he should have done. I think the regulations, as explained by the several conductors' books put in proof, and the explanations of the dates when they were in force, and the explanations as to the meaning of the terms "straight fare," "train rates," "conductors' rates," etc., as given by the witnesses, will show that this is not the fact. But I do not go into that, because the principle of this judgment is the same, whether the conductor demanded too much or not. A moving train is no place to wrangle with the conductor about rates. His demand for fare should be complied with, or the passenger peaceably and quietly leave the train

and seek his remedy at law. He cannot compel ejection with force and increase his damages because the conductor asks too much. If he tenders the proper fare and it is refused, the law will compensate him in damages, but he cannot force himself on the conductor in a dispute about rates, any more than in a dispute about tickets. It is not like the class of cases where the passenger is ejected for refusing to comply with unreasonable regulations in the matter of the manner and mode of carrying him, or like violation of the contract. There the public policy which requires carriers to respect the rights of people to accommodation according to contract, to protection to life and limb, etc., authorizes the courts and juries to enforce that policy by damages which are not altogether, perhaps,— at least where there is personal indignity or violence,—measured by the nicest scales of exact injury so much as by the force of example required to compel the carrier to do his duty to the public. *Railroad Co.* v. *Brown*, 17 Wall. 445; *Pennsylvania Co.* v. *Roy*, 101 U. S. 451; *Gallina* v. *Hot Springs R. Co.* 13 Fed. Rep. 116. These overcharges in rates for transportation can be compensated by the money overpaid and interest, and I do not see that the public policy referred to here requires that in the multitude of business a carrier shall be held never to make mistakes, or always to be exactly right in all disputes about contracts under the penalty of punitive damages. The argument that the case is governed by the strict law of contract which is so urgently pressed by general analogies of a contract to do a thing, and a neglect or refusal to do it, is met by the judgment in favor of the plaintiff for the full amount of the loss he sustained by the breach, and there is a misapplication of these analogies when we overlook the fact that the passenger makes his contract with reference to all the reasonable rules prescribed by the company for the useful conduct of its business, not only for its own convenience and profit, but also for that of the public as well.

A very vigorous protest is made by the argument against the doctrine of contributory negligence, as applicable to a case like this, but it is only at last a controversy about terms. Perhaps it is more technically correct to say that the conduct of the conductor of the train being unobjectionable, the injury complained of was not the direct result of any fault of his or the defendant corporation which he represented, and it is not, therefore, liable to the plaintiff, but it could have been prevented if the plaintiff had chosen to pay the fare demanded, and in that sense it was the result of his own negligence, rather than anything the conductor did.

It is further argued that the conductor put the plaintiff off at an improper place. It was a regular station, and his regulations required him to evict a passenger refusing to pay fare at the next station. There was no hotel at the place, but there were houses of citizens close by, and there was at the station a room, not very elegant to be sure, but all that the railroad could be required to furnish at such a place for waiting passengers. I know of no rule of law which requires a railroad company to furnish recalcitrant passengers with accommodations of any kind when put off the train for refusing to pay fare, or to put them off only at stations having hotels. They might not be allowed to put them off between stations, where they cannot see agents or procure tickets without extraordinary trouble, or in a wilderness or a desert, to suffer by starvation or for want of lodgings, but this station afforded as much as the company could be required to provide in such cases.

On the whole case, it seems to me now, as at the trial, that the plaintiff's suit must be treated as if he had quietly left the train and sued for a breach of his alleged parol contract to be carried at the reduced rate of limited tickets after the limitation had expired, and that inasmuch as he shows no special damage to his business or otherwise, resulting from the delay, his recovery must be limited to the extra fare paid, the other injuries complained of being the cause of his mistaken notions about his right to be carried on the expired tickets, and his resistance to the proper demand of the conductor that he should, in the absence of any evidence of his contract, pay train fare.

As before remarked, there are cases which do not, in the text of the opinions and perhaps as adjudications, justify this judgment, but it finds support in others which seem to me more sound. Remarking that the case of *Louisville R. Co.* v. *Garrett,* 8 Lea, 438, does not, in my judgment, in the least contravene the views here expressed, and that the case of *Walker* v. *Langford,* 1 Sneed, 514, fully sustains them, although that was a contract of a wholly different nature, when it rules that a plaintiff cannot increase his damages for a breach of contract by neglecting, or refusing at his own expense, to do that which would lessen them, I close this opinion with a citation of the principal and most pertinent cases cited on either side, without attempting to review or reconcile them. *Frederick* v. *Marquette R. Co.* 37 Mich. 342; *Chicago R. Co.* v. *Griffin,* 68 Ill. 499; *Pullman Car Co.* v. *Reed,* 75 Ill. 125; *Ill. Cent. R. Co.* v. *Johnson,* 67 Ill. 312; *Cincinnati R. Co.* v. *Cole,* 29 Ohio St. 126; *Townsend* v.

*N. Y. Cent. R. R.* 56 N. Y. 295; S. C. 4 Hun, 217; *Cox* v. *N. Y. Cent. R. R.* 4 Hun, 176, 182; *English* v. *Delaware & H. Canal Co.* 66 N. Y. 454; S. C. 4 Hun, 683; *O'Brien* v. *N. Y. Cent. R. Co.* 80 N. Y. 236; *Hamilton* v. *Third Ave. R. Co.* 53 N. Y. 25; *Jackson* v. *Second Ave. R. Co.* 47 N. Y. 274; *Jeffersonville R. Co.* v. *Rogers,* 38 Ind. 116; *Pittsburgh, etc., R. Co.* v. *Hennigh,* 39 Ind. 509; *Palmer* v. *Railroad,* 3 Rich. (N. S.) 580; *Maples* v. *N. Y., etc., R. Co.* 38 Conn. 557; *Burnham* v. *Grand Trunk R. R.* 63 Me. 298; Thomp. Carr. 337; Hutch. Carr. §§ 570, 575; 5 South. Law Rev. 770.

Motion overruled.

See S. C. 9 FED. REP. 585; *Gray* v. *Cincinnati South. R. Co.* 11 FED. REP. 683; *Maskos* v. *Amer. Steam-ship Co.* 11 FED. REP. 698; *Brown* v. *Memphis, etc., R. Co.* 7 FED. REP. 51; S. C. 5 FED. REP. 489.

---

### Recent Decisions on the Rights of Passengers.

§ 1. PRELIMINARY. The principal case was reported in 9 Fed. Rep. 585, where the learned judge, in charging the jury, ruled substantially the same question which is again ruled as above, that, although a passenger may have a right to be carried under a special contract, if he be not provided with a ticket which the conductor can recognize, he must pay the fare demanded by the conductor, under a reasonable regulation requiring him to demand fare of persons without tickets, and cannot insist on being expelled by force, as a foundation for a suit for damages for wrongful expulsion. By this conduct he contributes to his injuries, which are the direct result of his own conduct, and not the breach of any special contract he may have for his carriage.(a)

A case involving the same facts as the above case was tried in December in the circuit court of Shelby county, Tennessee, before the Hon. JAMES O. PIERCE, who is well known to the profession as a judge of exceptional culture and ability. Mrs. Clendenin was traveling with Mr. and Mrs. Hall, her parents, on the same kind of a ticket, bought at the same time and under the same circumstances, and expiring at the same time. They went to Texas, and, on their return, reached Memphis on the very day their tickets were to expire. The time when they expired was midnight. They got on board a train which left Memphis at 11:59 P. M. The conductor refused to recognize their tickets, claiming that they had expired, and demanded what is known as "conductor's fare" from Memphis to Town Creek. They declined to give this, and offered to pay "agent's fare," which is somewhat less; whereupon the conductor put them off at White's station, which is 10 miles out, where they remained all night, without any place to sleep, and exposed to the weather. Mr. and Mrs. Hall brought the above suit for damages in the United States circuit court claiming $20,000, and recovered the amount of the extra fare which Mr. Hall was obliged to pay in order to reach home. Clendenin and

(a) Hall v. Memphis, etc., R. Co. 9 Fed. Rep. 585.

wife, suing in the state court, had better luck; they had a verdict for $2,500. At the trial, Judge Pierce charged the jury as follows:

*"Gentlemen of the Jury:*

"Two principal questions are presented in this case for your determination.

"*First.* Did the plaintiff, at the time she was ejected from the defendant's train, have a valid contract, then in force, for carriage from Memphis to Town Creek.

"*Second.* If she did not have such a contract, and refused to pay the regular fare therefor, at the defendant's established rates, when demanded by the conductor, in which case she had no right to remain on the train, then did the conductor put her off at any place other than a regular station, or did he in ejecting her use any more force or violence than was necessary?

"It is admitted that when plaintiff's agent, Hall, purchased the ticket in question, nothing was said by him concerning the 30-days' limitation upon the ticket. You are instructed that if this were all, the plaintiff could not claim the right to use the ticket after the 30 days expired; and if she endeavored thereafter to ride on defendant's train upon that ticket alone, and refused to pay the regular fare established by the company's regulations, she was wrong in so doing, and the defendant had the right to eject her from the train.

"The rule on this point would be the same if plaintiff's agent, Hall, purchased the ticket by mistake, and afterwards asked the ticket agent to take it back and give him his money or another ticket, or to exchange tickets, and the ticket agent refused.

"Whatever claim or demand, if any, the plaintiff may have had upon the defendant by reason of such refusal, she had, under the circumstances stated, no right to ride upon defendant's train in defiance of its regulations, and without paying the fare as provided by those regulations.

"The rule would be the same if you find that defendant's ticket agent might have exchanged the ticket in case he desired to, but refused to do so, no matter from what motive.

"Again, if you find that, after so purchasing the ticket, plaintiff's agent, Hall, in endeavoring to get an exchange of tickets, asked the ticket agent who sold him the ticket whether plaintiff could not ride on the ticket after the 30 days had expired, and that the said ticket agent told Hall she could not do so, or that he did not know, or that he did not assure him she could do so, the rule would be the same as above stated, and plaintiff would have no right to carriage upon that ticket after the 30 days expired.

"If, without the right to do so, she endeavored to ride upon the expired ticket, and the conductor refused to permit her to do so, and demanded her fare, it was her duty either to pay the fare or leave the train. Her fare would be the regular rate, according to the defendant's established regulations; and an offer to pay the difference between such fare and the sum that had been paid, either in whole or in part, for the expired ticket, would not be an offer to pay fare.

"If, however, you find that Hall, the plaintiff's agent, on the same day applied to the ticket agent for an exchange of tickets, and stated that the tick-

ets he had purchased were not what he wanted, and had been purchased by mistake, and the ticket agent told him that the 30-days' limitation would not be enforced by the defendant, but that the ticket in question would serve plaintiff's purpose for longer than 30 days, and assured him that she could use the ticket for carriage after the 30 days expired, and that Hall relied on those representations, and for this reason did not purchase other tickets, and that plaintiff was relying thereon when endeavoring to ride from Memphis to Town Creek at the time she was ejected, then you will inquire and determine from the evidence whether such assurances by the ticket agent were within the actual or apparent scope of his authority.

"In considering these questions you will observe that Hazlewood was the regular ticket agent of the defendant at Town Creek, and you are instructed that Hazlewood's private clerk, Houston, became ticket agent only as he exercised Hazlewood's power in selling tickets, and for such act only, and for the time only when engaged in selling a ticket or tickets, and was not such ticket agent when not so engaged, and his authority in regard to selling any particular ticket or tickets terminated when that ticket or those tickets had been sold and delivered. Daniel's power or agency to sell tickets for Hazlewood was limited in like manner.

"If you find that Houston alone was engaged in selling the tickets in question, and Daniel took no part therein, then Houston, and not Daniel, was the ticket agent in this transaction; and if you find this to be so, then any remark, statement, or assurance made at the time by Daniel as to a waiver by the defendant of the 30-days' limitation would not be the act of the ticket agent, and would not bind the defendant.

"But if you find that, in connection with the sale of the tickets in question, Houston made any statement or assurance concerning the 30-days' limitation, you will then inquire and determine from the evidence whether it was within either the actual or the apparent scope of the ticket agent's authority to give such statement or assurance.

"In considering what was the actual scope of the ticket agent's authority, you will look to all the evidence in the case, including the instruction to agents given by the defendant, the practice as to printing, preparing, and issuing tickets, the form of the tickets and the limitations or stipulations on their face, and the manner in which they were sold by ticket agents.

"If you find that it was not within the actual authority of the agent to waive the limitation to 30 days, expressed on the face of the ticket, then you will determine whether it was within the apparent scope of his authority.

"If you find that it was part of the business of the agent at Town Creek to attend to all the business of the defendant at that place in the way of selling tickets, then you will determine, from the evidence, whether the defendant authorized or allowed such agent to transact the business in such a way as to make it appear that he had authority to waive the limitation to 30 days on the face of these tickets, or whether the defendant held him out to the public as having such authority, or knowingly allowed him to exercise or acquiesced in his exercise of such authority; and, further, whether Hall, the plaintiff's agent, was ignorant of the actual scope of the ticket agent's authority, and relied on the appearances so indicated. In determining this question you will

consider the manner in which the tickets are usually prepared and issued, and put in the hands of agents for sale, so far as appears from the face of the tickets; the manner in which they are sold, and anything else that is known about the matter by the traveling public generally.

"If it was not within the actual scope of the ticket agent's authority to waive the 30-days' limitation, and Hall knew it was not, then he had no right to rely on the ticket agent's waiver of the limitation, and the plaintiff cannot base her contract on it, and cannot claim to ride upon the ticket in question. Or, if you find under the instruction above given that it was not within either the actual or apparent scope of the ticket agent's authority to waive that limitation, then Hall had no right to rely on such a waiver, even if you find that the ticket agent waived, or attempted to waive, that limitation, and that Hall relied on it; for if the act of the ticket agent in making such waiver was not within either the actual or the apparent scope of his authority, it did not bind the defendant, and the contract remained as it appeared to be on the face of the ticket; and if you so find, your verdict on this point will be in favor of the defendant.

"But if the act of the ticket agent in waiving the 30-days' limitation was within the scope of his authority, as it appeared to be from the usual and customary way in which he transacted the defendant's business, with the knowledge and approval or acquiescence of the defendant, and if you find that he did waive that limitation, and that Hall relied on such waiver, and the plaintiff undertook to use her ticket accordingly, this was a contract between the parties, and your verdict will be for the plaintiff; and, in considering whether Hall relied on such waiver, you may consider any assurances in regard to the same subject which were previously given by Hazlewood, and which were in like manner within the apparent scope of the ticket agent's authority, if you find from the evidence that any such assurances were given by him.

'If the plaintiff was on the train upon a ticket unlimited in time either by the express terms of said ticket, or by a valid verbal contract or understanding with the station agent at Town Creek, who sold the ticket, then the railroad is liable for damages, if the conductor ejected her from the train, notwithstanding the fact that a strict construction of the rules laid down by the company for the guidance of the conductor made it his duty towards the company to expel her.

"If you find from the proof and from the charges given that the plaintiff was rightfully on the cars, and that she should not have been put off, then the touching of plaintiff, however gently, in the effort to put her off by the conductor, was an assault upon her, for which the defendants are liable.

"If you should be of opinion that the violence, if you find any, used by the conductor in expelling plaintiff was not greater than he was compelled to use, and for which the company would not be liable if the expulsion had been lawful, yet if you find that the expulsion was unlawful, then any violence or laying-on of hands upon the plaintiff by the conductor was excessive and unwarranted, and constituted an assault upon the plaintiff, for which the defendants are liable.

"If, however, you find under the foregoing instructions that the plaintiff had no valid contract with the defendant for carriage after the 30 days ex-

pired, then the plaintiff had no right to ride on the train without paying the fare required by the regulations, and if she refused to do so the defendant's agents had a right to eject her from the train.

" But this must be done at a regular station, and with the use of no more force or violence than is necessary for the purpose.

" A regular station is one at which the passenger trains on the road, or the majority of them, regularly and customarily stop to put off and take on passengers.

"If you find that defendant's agents put the plaintiff off at such a station, using no more force or violence than was necessary, then your verdict on this point will be for the defendant. If you find that they put her off at some place not a regular station, or if you find that they used more force or violence than was necessary, then, in either case, this was a wrong on the part of defendant, and your verdict on this point will be for the plaintiff.

" But if the plaintiff had no right to ride on the train without paying fare, and refused to pay fare, it was her duty to leave the train when so required by the conductor; and if no more force or violence was used than was made necessary by her own resistance to the demand of the conductor that she leave the train, this was not a wrong on the part of the defendant, and your verdict in this respect will be for the defendant.

" If you find against the plaintiff on all the points stated in the foregoing instructions, then your verdict will be for the defendant.

" But if you find in favor of the plaintiff on any one of those points, then you will proceed to estimate her damages under the following instructions, and you will return the same in your verdict.

" If, under the instructions given, you should find a verdict in favor of the plaintiff, the court instructs you that, in estimating damages to be awarded the plaintiff, you will allow the losses and expenses actually incurred by her, and include compensation for physical suffering and inconvenience, if any, and for mental suffering and any sense of mortification, humiliation, and degradation suffered by the plaintiff by reason of such expulsion in the presence of her family and in the presence of other passengers, and including compensation for pain and inconvenience and expenses experienced while waiting at the place where she was put off, until she could obtain another train; and for any injury to her health by reason of exposure to the weather, under the circumstances, if you find that she was so exposed.

" But if you find from the evidence that plaintiff and her mother and father were evicted at the same time and place from defendant's train because their tickets were all alike upon their face,—expired limited tickets,—and all three refused to pay the fare demanded by the conductor, and you should find for the plaintiff, you can allow no damages in this case because of the eviction of the father and mother of plaintiff, nor because of any hurts or injuries or discomforts sustained by them, nor because of any suffering or misery or mental anxiety of plaintiff at witnessing their expulsion or hurts, injuries or discomforts."

It will be seen, by comparing the foregoing cases, that both of these able judges agree upon the question that the ticket agent of a railway company may

have power to make representations respecting the tickets which he sells, which will bind the company and form a part of the contract between the carrier and the passenger; but they differ upon the question of damages,—Judge HAMMOND holding, as I understand him, that the measure of damages is the unearned passage money; that the passenger cannot insist upon the conductor recognizing an oral engagement, made by a ticket agent of the company, which is in violation of the regulations of the company, and of which the conductor has no knowledge, except through the representations of the passenger, and make his refusal to do so a ground of expulsion in order to recover enhanced damages; and Judge PIERCE holding, as I understand him, that the passenger has a right to stand upon the contract as made; to insist upon its performance, and, if expelled from the carrier's vehicle, to recover the same damages which he would be entitled to recover if expelled at the same time and place, under the same circumstances and in the same manner, for any other wrongful cause.

The proof before Judge PIERCE presented a question not presented in the other case. At the station where the travelers were ejected there were no lights, no station agent, no one to sell tickets, and they tried in vain to procure tickets, so as to proceed on the same train. The conductor who had refused "ticket fare" when tendered, and demanded "conductors' fare," knew when he put them out that there was no agent there to sell tickets. What was, then, his duty towards them, and were they entitled to ride on "ticket fare," as *bona fide* passengers who were not permitted to purchase tickets?

It is not proposed in this note to *review*, much less to criticise, the decision of the learned judge in the principal case, nor the charge of Judge PIERCE above set out. It is thought that the needs of the readers of the FEDERAL REPORTER will be better subserved by reviewing all the decisions of the English and American courts relating to the rights of passengers and carriers of passengers under the various contracts of carriage, which have been rendered during the last two years, or since the publication of any edition of any general work on the subject; referring to prior decisions only so far as necessary to a discussion of the recent cases examined. Such being the purpose of this note, the reader will not expect a connected discussion of any one topic. On the contrary, a great many topics will be touched upon which have not been suggested by anything decided in the principal case. One feature of the principal case has, however, been examined, in the light of some recent decisions, in section 7, *infra*.

## I. As to Certain Regulations of Carriers.

§ 2. REASONABLENESS OF CARRIER'S REGULATION—WHETHER A QUESTION OF LAW OR FACT. It has been held by one court that the reasonableness of a regulation of a carrier of passengers is a question of fact for the jury.(a) Other courts regard it as a mixed question of law and fact, and say that it is always proper to submit it to the jury under proper instructions.(b)

(a) State v. Overton, 24 N. J. L. 435, 441; Morris R. Co. v. Ayres, 29 N. J. L. 393.

(b) Bass v. Chicago, etc., R. Co. 36 Wis. 450; S. C. Thomp. Car. Pass. 311; Day v. Owen, 5 Mich. 520; Brown v. Memphis, etc., R. Co. 4 Fed. Rep.

Hence, this question cannot be determined on demurrer.(c) But this does not apply to all regulations. There are certain regulations, the reasonableness of which is so obvious that they may be held reasonable as matter of law. Indeed, there are regulations, the reasonableness of which is settled by a line of adjudications. Of this nature may be named the regulation of railway companies requiring passengers to purchase tickets before taking seats in their cars, or, in default of this, to pay extra fare.(d) The reasonableness of such a regulation is found in the fact that, without it, carriers could not protect themselves from being defrauded at will by train agents. So a regulation of a railway company prohibiting persons from riding on its freight trains unless they previously purchase tickets at a station, is held reasonable as matter of law.(e)

§ 3. EXCLUDING PERSONS OF EVIL REPUTE. In a recent decision of the learned and accomplished judge who wrote the opinion in the principal case, this question is considered with reference to the right of a carrier to exclude from his vehicles unchaste women. The learned judge charged the jury that, in determining whether the expulsion was lawful or not, the same principles were to be applied to women as to men; that the social penalties of excluding unchaste women from hotels, theaters, and other public places could not be imported into the law of common carriers; that the carrier is bound to carry the good, the bad, and the indifferent, and has nothing to do with the morals of his passengers, if their behavior be proper while traveling. Neither can he use the character for chastity of his female passengers as a basis for classification, so as to put all chaste women, or women who have the reputation of being chaste, into one car, and all unchaste women, or women who have the reputation of being unchaste, into another car. Such a regulation would be contrary to public policy, and unreasonable. It would put every woman purchasing a railroad ticket on trial before the conductor as her judge, and, in case of mistake, it would lead to breaches of the peace. It would practically exclude all sensible and sensitive women from traveling at all, no matter how virtuous, for fear they might be put into, or occasionally occupy, the wrong car. The police power of the carrier, continued the learned judge, is a sufficient protection to the other passengers, and he can remove all persons, men or women, whose conduct at the time is annoying, or whose reputation for misbehavior and indecent demeanor in public is so notoriously bad that it furnishes a reasonable ground to believe that the person will be offensive or annoying to others traveling in the same car; and this is as far as a carrier has any right to go. He can no more classify women according to their reputation for chastity, or want of it, than he can so grade men. He accordingly charged the jury, in substance, that a female passenger traveling alone is entitled to ride in the ladies' car, notwithstanding an alleged want of chastity, if her behavior is ladylike and proper; and she cannot be compelled to accept a seat in another car offensive to her because of smoking and bad ventilation.(a)

(c) Brown v. Memphis, etc., R. Co. supra.

(d) In Iowa this regulation is allowed by statute. Hoffbauer v. Railroad Co. 52 Iowa, 342.

(e) Lane v. Railroad Co. 69 Tenn. (5 Lea,) 124; infra, § 4.

(a) Brown v. Memphis, etc., R. Co. 5 Fed. Rep. 499, 500.

There is no doubt of the propriety of these views. It is equally free from doubt that, within certain limits, it is within the power of the carrier to exclude from his vehicle persons of notoriously bad repute, who seek to go on board in an indecent condition, or for the purpose of plying some vocation injurious to the welfare of the other passengers. For instance, if a person were to present himself for carriage dressed in such a manner as to make an indecent exposure of his person, no court would hold the carrier liable in damages for refusing to carry him. Accordingly, it has been held that the conductor of a street-railway car may expel therefrom a person who, by reason of intoxication or otherwise, is in such a condition as to render it reasonably certain that by act or speech he will become offensive or annoying to other passengers, although he has not committed any act of offense or annoyance.(b) Railway carriers may, in like manner, exclude from their trains gamblers or monte men, whose evident purpose in taking passage is to ply their vocations; though, if such persons have purchased their tickets, they cannot thereafter be refused passage without a return of the passage-money which they have paid.(c) On the other hand, if the carrier knowingly permit such persons to take passage on his vehicle, and if a minor is swindled out of money by their gambling devices, through the negligence or indifference of the carrier's servants, the carrier will be liable for the money so lost.(d) So, if his servants have power to prevent it, but, neglecting their duty in this respect, they permit drunken or disorderly persons to come on board his vehicle and injure a passenger, he will be liable; but here, as in other cases, his liability is based on the principle of negligence; he is not an insurer of the passenger, and liable at all events.(e) So a railway conductor may eject from a coach a passenger who uses grossly profane and obscene language in the presence of ladies; for such conduct, although provoked to it, works a forfeiture of his right to be carried.(f)

§ 4. REGULATION THAT PASSENGERS ON FREIGHT TRAINS MUST PROCURE TICKETS. A regulation allowing persons to ride upon freight trains, provided they will procure tickets before entering the cars, is a reasonable regulation;(a) and where opportunity is afforded for the procuring of such tickets, and the passenger does not avail himself of it, or make a reasonable attempt to do so, and, in consequence thereof, is expelled from the train, he cannot recover damages.(bb) But where the company has been in the habit of allowing its conductors of freight trains to receive money from passengers, and has changed the rule, the public are entitled to notice of the change; and a passenger who has been in the habit of riding on the company's freight

---

(b) Vinton v. Middlesex R. Co. 11 Allen, 304; S. C. Thomp. Car. Pass. 6; Murphy v. Union R. Co. 118 Mass. 228; Pittsburgh, etc., R. Co. v. Vandyne, 57 Ind. 576. See, also, State v. Ross, 26 N. J. L. 224.

(c) Thurston v. Union Pacific R. Co. 4 Dill. 321. Compare Coppin v. Braithwaite, 8 Jur. 875.

(d) Smith v. Wilson, 31 How. Pr. 272.

(e) Pittsburgh, etc., R. Co. v. Hinds, 53 Pa. St. 512; S. C. Thomp. Car. Pass. 295.

(f) Chicago, etc., R. Co. v. Griffin, 68 Ill. 499.

(a) Lane v. Railroad Co. 69 Tenn. (5 Lea,) 124. A regulation refusing to carry passengers on freight trains altogether, is also reasonable. Illinois, etc., R. Co. v. Johnson, 67 Ill. 312, 314; Chicago, etc., R. Co. v. Randolph, 53 Ill. 510; Railway Co. v. Moore, 49 Tex. 31; Hazard v. Chicago, etc., R Co. 1 Biss. 503; Mobile, etc., R. Co. v. McArthur, 43 Miss. 180. A regulation is also reasonable which provides that only those passengers shall be carried on freight trains who are provided with tickets of a particular description; as, for instance, a round-trip ticket, a thousand-mile ticket, or a pass. Faulkner v. Ohio, etc., R. Co. 55 Ind. 369.

(bb) Indianapolis, etc., R. Co. v. Kennedy, 3 Amer. & Eng. R. Cas. 467, (Sup. Ct. Ind.)

trains, and paying his fare in this way, who has not been fairly notified of the change, and who does not, in fact, know of it, cannot be expelled for non-compliance with it without subjecting the company to liability for damages.(*c*) Under the circumstances of one case, it was held that putting up a notice of this change of rule at the station house was not sufficient.(*d*)   And if a railway company, after having carried passengers upon its freight cars, adopt a regulation excluding them altogether, and a person, not knowing of such regulation, purchases a ticket of a station agent, and receives from such agent an assurance that the ticket will entitle him to ride on a freight train, but, attempting to ride on the ticket, is nevertheless expelled from the train by the conductor in consequence of such regulation, the passenger may, it has been held, recover exemplary damages from the company.(*e*)   But where a railroad company enforces such a rule, it is under an obligation to the public to furnish facilities for the purchase of such tickets, and, to this end, it must have an agent to sell them at its regular station, and such agent must keep his office open for a reasonable time prior to the regulation time for the departure of such trains.   It will not be permitted to complain of a violation of its rules caused by the negligence of its own agents.   If, therefore, a passenger is prevented from purchasing such a ticket by the absence of the agent from the station, he may rightfully take passage on such a train without a ticket, on tendering the regular fare to the conductor, and his expulsion will be unlawful.(*f*)

§ 5. PENALTY FOR RIDING WITHOUT PAYING FARE.   The English railway clauses consolidation act imposes a penalty upon any person who shall travel in any carriage of a railway company without having previously paid the fare, and with intent to avoid the payment thereof;(*a*) which penalty is recoverable in a summary proceeding before two justices of the peace,(*b*) and enforced by distress warrant.(*cc*)   By other sections of the same act, railway companies have, it seems, power to make by-laws to prevent persons from riding on their cars without paying fare, and from riding on cars of a class superior to that called for by their ticket.(*dd*)

§ 6. STATUTORY REGULATIONS WITHOUT EXTRATERRITORIAL FORCE.   A statute of a state which attempts to prescribe a regulation for a railway company extending into another state, is inoperative beyond the limits of the state whose legislature has passed the act.   The obvious reason is that the police regulations of the states have no extraterritorial force.   But there is a further reason.   Congress alone has power to regulate commerce between the states and with foreign countries; and such an act would, therefore, in so far as it operates beyond the limits of the particular state, be in contravention of the federal constitution.(*aa*)   It was therefore held, under the statute of

(*c*) Lane v. Railroad Co. 69 Tenn. (5 Lea,) 124 Lake Shore, etc., R. Co. v. Greenwood, 79 Pa. St. 373.

(*d*) Lake Shore, etc., R. Co. *v.* Greenwood, supra.

(*e*) Kansas Pacific R. Co. v. Kessler, 18 Kan. 523.

(*f*) Chicago, etc., R. Co. v. Flagg, 43 Ill. 364; Illinois Cent. R. Co. v. Johnson, 67 Ill. 312; St. Louis, etc. R. Co, v. Myrtle, 51 Ind. 566.

(*a*) Act 8 Vict. c. 20, § 103.  See Reg. v. Pigot, 8 Q. B. Div. 151.

(*b*) Id. § 145.

(*cc*) Id. § 146.

(*dd*) Id. §§ 108, 109.   See Dyson v. London, etc., R. Co. 7 Q. B. Div. 32; Saunders v. Southeastern R. Co. 5 Q. B. Div. 456; Watson v. London, etc., R. Co. 4 C. P. Div. 118.

(*aa*) Hall v. De Cuir, 95 U. S. 485.

Maine,(b) which declares that the holder of a railroad ticket shall have the right to stop over at any of the stations along the line of the road, and that it shall be good for a passage for six years from the time it was first used, that where the plaintiff, who had bought a ticket from Portland to Montreal which contained the words "good only for a continuous trip within two days from this date," was put off the train in Canada more than two days after the date of the ticket, he could not recover damages.(c)

## II. As to the Contract of Carriage.

§ 7. EFFECT OF DECLARATIONS OF THE COMPANY'S AGENT TO PASSENGER. There are cases where the declarations of the station agent of the company, or of its train conductor, are held admissible, although contrary to the rules of the company, or to what appears upon the face of the ticket which the passenger has purchased. Indeed, the contrary rule has so little practical sense to support it, and proceeds in such obvious disregard of the rights of the traveling public, that it is a wonder how any court ever came to accede to it. The ticket agent of a railway company is appointed to give information to the traveling public about the rates and conditions of travel. To say that the traveling public are to be bound, in all cases, by what appears on the face of a ticket which is purchased, is unreasonable. The mass of the traveling public are ignorant persons. Many of them are women, and even children, without discretion enough to judge in such matters. Many of them cannot read the language. Most of them would confide in a statement deliberately made by a station agent as to what the train conductors of the company would do in case a particular ticket were purchased and presented to them. Now, suppose such a person presents himself at a railway ticket office and asks for a ticket to a distant place, and tells the agent that he wishes to stop over at an intermediate place, and the agent sells him a ticket on which is the recital, "Good for this day only." The passenger, acting on the promise of the agent, stops off, and, when he undertakes to resume his journey, is informed that he must pay the additional fare or leave the train. Will any fair-minded person say that a fraud has not been perpetrated upon him? Ordinary persons are bound by the acts of their agents in waiving the written conditions in contracts. Why is it that a railroad company should receive special favors at the hands of the law in this particular? Why should a doubtful point of law be so construed as to work a forfeiture of the rights of the traveler, and to permit the carrier to retain his money without giving him an equivalent therefor?

On this subject the supreme judicial court of Maine has made the following judicious observations: "Upon the plaintiff's ticket we find the indorsement 'good for this day only.' The fact that he accepted and produced it as proof of his right to a passage would certainly be *prima facie* evidence of his right to a passage on the day of its date alone, and possibly he would not be permitted to deny that he was bound by that indorsement, unless he could show that his assent had been withheld with the knowledge and consent of the company. This he attempts to do by showing just what contract was made with the ticket agent at South Paris. But it is said that this agent had no authority to change any of the rules of the company, and therefore his acts

---

(b) Me. St. 1871, c. 223.,                    (c) Carpenter v. Grand Trunk R. Co. 72 Me. 388,

or statements upon this point are not admissible. It may be conceded that this or any other agent had no authority to change or abrogate any rule established by the company; but the consequences claimed will by no means follow. He was placed there for the purpose of selling tickets, and, it may be admitted, such tickets as will secure a passage in accordance with the rules of the company. The plaintiff desired to purchase just such a ticket. He was ignorant of the rules of the company, but wished to go over one portion of the road one day and another portion the next day. The rules make a part of the contract. It seems that before this the conductor had been permitted to give 'stop-over checks.' This custom had been abrogated but a few days previous, of which, so far as appears, no notice had been given. This is the very point upon which the plaintiff desires information. To whom shall he go to obtain it? To whom can he go but to the person appointed by the company for the purpose of giving such information, and selling the proper tickets? To that person he does go, and is informed that the custom of giving stop-over checks still continues, and that it is necessary to purchase but one ticket. Relying upon this information, as he was justified in doing, he purchased his ticket and paid the fare demanded for the whole distance. The real contract between the plaintiff and the ticket agent was made before the ticket was seen. The plaintiff paid his money upon the statement of the agent, and not upon any indorsement upon the ticket. He took the ticket, not as expressing a contract, but as proof of the contract he had already made with the agent. He had neither seen nor assented to the indorsement, nor was he asked to assent to it. As between the plaintiff and agent the contract was definite, with no misunderstanding or suggestion of it. Under that contract the plaintiff commences his journey, and, on the first day asks for his ' stop-over check,' and is informed by the conductor, not that his ticket is not sufficient, or in any way different from those previously issued, but that his orders were not to give out any more 'stop-over checks.' Still he was permitted to retain his ticket, encouraged to expect that he would be permitted to complete his passage according to his understanding of the contract. On the next day, however, his ticket was refused, and, upon demand being made, he refused to pay a second fare, whereupon he was expelled from the cars. The conductor acted in obedience to orders from his superiors; the plaintiff, in obedience to information he had received from the ticket agent and upon which he had paid his money; surely, then, he was not in the wrong. But it is said the company were not bound by the contracts of its agent. Admit it. The conductor had proof from the ticket that the fare had been paid for the whole distance, and, from the statements of the plaintiff, which he had no reason to doubt, and which were confirmed by the custom so lately abrogated, that he had paid it upon the representations of the agent that the ticket would carry him through. If, under these circumstances, the company, through the conductor, would repudiate or deny the contract, the least they could do would be to pay back the surplus money that they had received, or deduct it from the fare claimed, neither of which was done, or offered to be done; and this they were legally bound to do before refusing to execute the contract made by their agent, even if they were not bound by it."(*a*)

(*a*) Burnham v. G. T. Ry. Co. 63 Me. 298, 302.

In like manner, where a person purchased of the agent of a railway company a ticket sold at reduced rates to persons intending to purchase lands of the company, called "a land-exploring ticket," which ticket embodied the terms of a special contract to be signed by the purchaser of the ticket, the fact that the purchaser had not signed the ticket would not authorize an agent of the company to refuse to honor the ticket; since it was the duty of the agent selling the ticket to require the signature of the purchaser. The holder of the ticket could not be affected by the neglect of the company's agent in this particular, nor could the company plead his default, when sued for a breach of the contract named in the ticket.(b)

So, a steam-ship company forwarded passengers from Hamburg to America, partly by connecting lines. Its passenger agent at Hamburg, who was also agent for other lines of steamers, made verbal representations to the plaintiff that the company would be responsible for his baggage in the hands of connecting lines, as well as in its own hands. The plaintiff purchased a passage ticket on the faith of these representations. His trunk was lost by one of the connecting lines. It was held that the company selling the ticket was liable for the loss, and that it was no defense to show that the agent, in making such representations, exceeded his instructions.(c)

But it has been held, in accordance with the view of the learned judge in the principal case, that while the company may be liable for a breach of the contract embodied in the agent's representations, on the faith of which the passenger has paid his money, yet this will not justify the passenger, on learning that the agent exceeded his instructions, in insisting upon being expelled from the train, in order to make his expulsion a ground for recovering enhanced damages. Thus, in the view of the supreme court of Michigan, passengers may rightfully rely upon information given by station agents of the company as to the particular trains on which they will be allowed to travel on a coupon ticket; but if the information thus given is erroneous, so that the passenger finds himself on a train which does not stop at the desired point, he must, upon being advised of that fact by the conductor, get off at the preceding station; he cannot remain upon the train if it has gone beyond the point where he desired to get off, and to which his ticket entitled him to ride, provided he had got upon the train which, according to its schedule, stopped at that point, and refuse to pay fare, and compel the conductor, acting under the rules of the company, to put him off, and then seek redress in damages. The safety of the public requires that railway trains should be run according to fixed regulations and schedules, and when the passenger discovers that the agent at the station has given him erroneous information, he must act reasonably; he cannot compel the conductor to depart from the schedule upon which he is required to run his train, merely by informing him that the station agent has said that the train would stop at a particular place; but he must either get off before the train reaches the station in question, or go on to a succeeding station, paying the additional fare, and then seek his redress in damages for the failure of the company to transport him according to the representations of its agent. He cannot recover for the additional damages which

---

(b) Gregory v. Railroad Co. 10 Neb. 250.          (c) Maskos v. American Steam-ship Co. 11 Fed. Rep. 698.

he causes to himself by his own voluntary act; he cannot, by insisting upon remaining upon the train without paying fare, in violation of what he learns is the rule upon which the conductor is required to run his train, subject himself to forcible expulsion from the train, and then recover damages for the force used.(*d*)

A case in New York proceeds on substantially the same grounds. A passenger having purchased a ticket for L., told the ticket agent what train he wished to take, and was directed to take a particular train. He followed this direction; but the train which he took, after running 150 miles, deflected to a branch road, which did not pass through, but was followed an hour later by a train which did pass through, that place. It was held that if, on the arrival of the train at the point of deflection, notice was given that the passengers for L. must change cars, in such a way that passengers of ordinary intelligence and understanding, making proper use of their faculties, could hear it and understand it, the plaintiff was wrongfully on the cars after they left that point; and if he was carried past the point of divergence without fault on his part, but was apprised of his error, and requested to take a return train, upon which he would have been carried back free in season to have reached the train which would have carried him to L. without delay, his refusal to do so, and his persisting in remaining on the wrong train, rendered him liable to expulsion as a trespasser.(*e*)

On the contrary, it has been held in New Jersey that a passenger cannot rightfully rely upon the assurance given him by a train conductor, contrary to the purport of his ticket, that it will entitle him to stop over and resume his journey, although the conductor, in earnest of what he says, puts his initials upon the ticket; and where, in such a case, it appeared that only train agents had the power to modify the statements made on the tickets themselves, it was held that the passenger who had received and acted upon such information, and had subsequently been put off the train by a subsequent conductor, had no cause of action against the company.(*f*)

§ 8. CARRIER, HOW FAR BOUND BY STATEMENTS OF TICKET. On the other hand, the carrier is bound to make good what the ticket imports on its face, and the passenger is not bound by any rule or usage of the company not *so* expressed, limiting the ticket, unless he has notice of the same. Thus, in a recent case, it appeared that the plaintiff, having paid for his passage over the defendant's route of street railway, was given, at an intermediate point therein, in return for an additional sum paid by him, a ticket on which were these words: "Third-avenue Railroad Company. Good only from Sixty-fifth street up to Yorkville and Harlem for a continuous ride. By order of the President." The ticket was indorsed, "Ticket check, July 6th, 1878." The plaintiff did not then use the ticket, but afterwards, on the same day, he entered one of the defendant's cars below and paid fare to such intermediate point, and, at a place above said point, tendered the conductor the ticket, which

(*d*) Lake Shore, etc., R. Co. v. Pierce, 47 Mich. 277; S. C. 3 Amer. & Eng. R. Cas. 340.

(*e*) Barker v. New York Central R. Co. 24 N. Y. 509.

(*f*) Petrie v. Pa. R. Co. 42 N. J. L. 449; S. C. 1 Amer. & Eng. R. Cas. 258.

was not accepted, and, on his refusal again to pay fare, was ejected from the car. It was held that, in the absence of knowledge by the plaintiff of any rule limiting his rights under said ticket, the company was liable for the above act of its servant.(a)  So, where a railway company had a rule which restricted to certain special trains the holders of a particular class of tickets, which tickets, nevertheless, purported to entitle the holder to passage on any regular train, it was held that the company could not rightfully expel from a regular train the holder of a ticket taking passage thereon, unless he had notice of the rule; and, upon the question whether he had such notice, evidence was admissible that the person of whom he bought the ticket told him that it would entitle him to ride on the train from which he was expelled, although the seller was not the agent of the corporation.(b)

Of course, this applies only in cases where the statements of the ticket are explicit.  A railway ticket is ordinarily a mere token of the fact that the holder or some other person has paid to the company issuing it the sum of money which entitles the holder to ride from a point named to a point named within the dates named.*  There may be outside of the ticket, in particular cases, an arrangement advertised by the company, under which the ticket is issued, which will limit the terms of the ticket itself.  Thus, a railroad company got up a cheap excursion over its road from Dexter to Belfast.  It hired a band of music to accompany it, paying each member thereof $25, and agreeing to give him a ticket for a lady free of charge.  One member of the band did not bring a lady, but brought his brother, a minor.  The boy somehow got one of these tickets intended for the ladies who should thus accompany the members of the band.  This ticket did not specify that it was for a lady, but simply read: "Maine Central R. R., July 30, 1877.  Dexter." It was held that this ticket did not entitle the boy to ride to Belfast without paying fare.(c)

§ 9. ASSIGNABILITY OF RAILROAD TICKETS.  As stated above, a railroad ticket is not ordinarily a complete contract to carry; it is looked upon either as a receipt for passage money, or as a token which, when presented by the buyer to the proper agent of the company over whose road it is issued, indicates to the latter that the person presenting it is entitled to be carried from and to the places named therein.(aa)  This ticket is ordinarily assignable by delivery, so as to pass to another holder the rights of the original purchaser, as against the company issuing it, or against the company on whose authority it may have been issued by another company.  If such a ticket is dishonored, one who has purchased it of a passenger has the same right of action against the company, by or for whom it was thus issued, which the original purchaser would have had.  Thus, where tickets were issued by the authority of the defendant company, over its line and a connecting line, to a point beyond its own terminus, for the purpose of promoting travel over its own line, and the

(a) McMahon v. Third Ave. R. Co. 47 N. Y. Sup. (Jones & S.) 282.
(b) Maroney v. Old Colony, etc., R. Co. 106 Mass. 153.
*See next section.
(c) Crosby v. Maine Central R. Co. 69 Me. 418.
(aa) Quimby v. Vanderbilt, 17 N. Y. 306; Henderson v. Stevenson, L. R. 2 Scotch App. 470, per Ld. Hatherley; Rawson v. Pa. R. Co. 48 N. Y. 212; Elmore v. Sands, 55 N. Y. 512, 515; Johnson v. Concord R. Co. 46 N. Y. 213; Gordon v. Manchester, etc., R. Co. 52 N. H. 596; State v. Overton, 21 N. J. L. 435, 438; Barker v. Coffin, 31 Barb, 550.

connecting line refused to honor them, it was held that a "ticket broker" who had purchased them from the passengers who could not use them for the reason named, could maintain an action against the company by whose authority they were thus issued, for the proportion of the passage money which they represented.(*b*)

§ 10. COMMUTATION TICKETS ISSUED TO PARTICULAR PERSONS. Railroad companies frequently issue tickets at reduced rates to persons living on the line of their roads, in the vicinity of cities, in which such persons transact their business, good for a prescribed period of time. These tickets are issued to the particular person, and embody the terms of a special contract with him, to the effect that the ticket shall be forfeited if found in the hands of any other person. Where such a ticket contained the stipulation, "If found in the hands of any one but the party in whose name it is issued, this ticket will be forfeited and taken up," it was held that it might be taken up by the conductor of the company issuing it, even when tendered by the party to whom it had been issued, if, in fact, it had been used by some other person.(*a*) But the holder of such a ticket is not, it seems, bound at his peril to see that no other person gets it and uses it. "There are," says the Maryland court, "circumstances under which the use of the ticket by another than the person to whom it was issued would not have the effect of its forfeiture,—where, for example, it had been taken from him by force or violence, and some means against which he could not have reasonably guarded; but he cannot be excused if he has been guilty of negligence or a want of due care. From the character of the ticket, and its liability to be used by another in fraud of the agreement that it is to be used only by the person to whom issued, the implied obligation rested upon him when he accepted it from the company to keep it with due and proper care. If, from his negligence, it came into the hands of another, and was fraudulently used upon the company's road, he is just as amenable to its forfeiture as if it had been used with his assent."(*bb*)

In England, railroad companies sometimes exact a deposit from persons purchasing such tickets, to be forfeited on certain conditions. The courts of that country seem disposed to construe the contract embraced in such ticket strictly, and not to relieve against the forfeiture; for they regard a strict compliance with the conditions as being of very great importance to the railway companies in the transaction of their business, and of little importance to each particular passenger,—the deposit being generally small, say 10 shillings. Hence, where one of the conditions of such a ticket was that it should be delivered up to the company "on the day after expiry," the court refused to extend this language so as to make it mean that the ticket should be delivered up within a reasonable time after expiry.(*c*)

§ 11. SPECIAL TICKET OBTAINED THROUGH FRAUD OF PASSENGER. The rule that a person who has been induced through fraud to enter into a contract cannot rescind the contract and at the same time keep the consideration,

---

(*b*) Hudson v. Kansas Pacific R. Co. 9 Fed. Rep. 879. The assignability of the ticket turned on the provisions of a statute relating to the assignment of choses in action, which, it is presumed has a counterpart in most of the states.

(*a*) Freidenrich v. Baltimore, etc., R. Co. 53 Md. 201.

(*bb*) Id.

(*c*) Cooper v. London, etc., R. Co. 4 Exch. Div. 88.

is a familiar one. The application of this rule to contracts made by agents is also well settled. Such a contract is not void, but voidable at the election of the principal, provided the election is made within a reasonable time after the discovery of the fraud. He may reject or ratify it, but he cannot ratify it in part and reject it in part. He cannot ratify it in so far as it is beneficial to him and reject it in so far as it is prejudicial to him. He cannot reject it and, at the same time, keep the consideration. This rule, of course, applies to the case where a person, through a fraud practiced upon the agent of a railway company, procures from the agent of the company a special ticket sold by the company at a reduced rate. Another agent of the company, on presentation of the ticket, cannot, on discovery of the fraud, refuse to honor the ticket without tendering to the holder the purchase money, or so much of the same as is unearned. Such a refusal will give the holder of the ticket a cause of action against the company.(d.)

§ 12. TICKETS ISSUED BY AGENTS OF OTHER COMPANIES. There seems to be a custom among connecting railroad companies in the United States to issue what are termed "coupon tickets" over each other's roads. Such a custom has been proved in cases which have come under the writer's cognizance, one of which is a recent case in Texas.(a) What the rights of the holder of a ticket issued in accordance with such a custom would be, it is not proposed now to discuss. It is supposed that if the custom had come to be a matter of public knowledge, and well recognized, a company refusing to honor a ticket, one of the coupons of which called for a passage over its road, would subject itself to an action. But if the ticket is not issued in accordance with the custom, clearly the holder of it has no action against a company, other than the one whose agent issued it, for refusing to honor it, unless it is shown that the agent had express authority from such company to issue it. It is said, in substance, that the agent of one railroad company thus issuing tickets over other roads, in accordance with such a custom, would, at most, stand in the position of a *special* agent for the other companies. He would not be their *general* agent in the sense which would make them liable for his representations and for his acts, done within the apparent scope of his authority. The person purchasing the ticket of him would act at his peril. The scope of his agency would be limited by the custom; and if the ticket did not conform to the custom, no action would lie against another company for refusing to honor it.(b)

§ 13. "NOT GOOD IF DETACHED. Coupon tickets, issued for a continuous passage over connecting lines, generally, if not universally, contain upon each coupon the legend, "Not good if detached." No action lies against a railroad company for refusing to honor a coupon ticket which contains this recital, and which, when presented to the conductor, is detached from its stub; and this is so, although the coupon may have been sold to the holder, thus detached, by the agent of a connecting company.(c)

§ 14. RIGHTS OF PASSENGER ON TRAIN WHICH DOES NOT STOP AT THE STATION CALLED FOR BY HIS TICKET. In the absence of a statutory provis-

(d) Gregory v. Railroad Co. 10 Neb. 250.          (b) Id.
(a) Houston, etc., R. Co. v. Ford, 53 Tex. 364.     (c) Houston, etc., R. Co. v. Ford, 53 Tex. 364.

ion to the contrary, a railway company may, for the benefit of its through travelers, and for the purpose of attaining speed in the conveying of mails and express matter, adopt a regulation that a certain train or trains of passenger cars running regularly on its road shall not stop at designated stations or places; and one traveling as a passenger on such road is bound to inquire whether the train upon which he takes passage stops at the station or place to which he is going.(*a*)   And, in the absence of such a statutory provision, where the conductor of a road which has made such a regulation finds, after the train has started, a passenger who holds a ticket for a station at which the train does not stop, and the passenger is unwilling to go to a station at which the train does stop, he may, in a proper manner, be removed from the train.(*b*)   But the power of a railroad company to adopt or enforce such a regulation is subject to legislative control.(*c*)   And where there is a statute requiring *all* passenger trains to stop on arrival at any municipal corporation on the line of the railway, having a given population, any person may purchase a ticket for such a city or town, and may claim the right to ride thereto and be put off thereat, on any passenger train which the company may run.   A notice printed on a ticket so purchased that particular trains do not stop at such a place, is of no binding force as against the passenger.(*d*)   It could not possibly impose upon him a greater obligation than would be imposed upon him by a special contract entered into between him and the company, that he should not be entitled to ride upon a particular train; and such a contract would be of no binding force, because it would be in contravention of a statute passed on considerations of the public good, and hence illegal.(*e*)   So far as a ticket containing such a notice may be held to embody the terms of a contract, it is subject to the rule that where a contract contains several covenants, some of which are in contravention of law, those which are lawful will be held valid, and those which are unlawful may be disregarded.(*f*)

### III. As to the Expulsion and Detention of Passengers.

§ 15. UNDER WHAT CIRCUMSTANCES THE CARRIER WILL BE LIABLE FOR THE ACT OF HIS SERVANT IN WRONGFULLY EXPELLING PASSENGER.   In one of the most recent contributions to the law on this subject, the following propositions are said to have been finally and firmly established: (1) That whether a wrongful act done by a servant of a railway company, not entirely inconsistent with the nature of his employment, was done by him in pursuance of his employment, and to serve the interest of his employer, or wickedly and maliciously, out of his own personal spite, is always a question for the jury.   (2) That where the jury find such an act to have been done in pursu-

(*a*) Pa. R. Co. v. Wentz, 37 Ohio St. 333, 337; Pittsburgh, etc., R. Co. v. Nuzum, 50 Ind. 141; Ohio, etc., R. Co. v. Applewhite, 52 Ind. 540; Ohio, etc.. R. Co. v. Swarthout, 67 Ind. 567.

(*b*) Pa. R. Co. v. Wentz, 37 Ohio St. 333, 337.

(*c*) Id. ; citing Com. v. Eastern R. Co 103 Mass. 254; Shields v. State, 26 Ohio St. 86; S C. 95 U. S. 319; State v. New Haven, etc. R. Co. 43 Conn. 351; New Haven, etc., R. Co. v. State, 44 Conn. 376; Pierce, Railr. (Ed. 1881,) 460; Const. Ohio, art. 13, § 2.

(*d*) Railroad Co. v. Campbell, 36 Ohio St. 647.

(*e*) Pa. R. Co. v. Wentz, 37 Ohio St. 333, 338. See Leake, Cont. 723; Spurgeon v. McElwain, 6 Ohio, 442; State v. Findley, 10 Ohio, 51; Bloom v. Richards, 2 Ohio St. 287; Huber v. German Con. 16 Ohio St. 371; Delaware Co. v. Andrews, 18 Ohio St. 49; Hooker v. De Palos, 28 Ohio St. 251.

(*f*) Railroad Co. v. Wentz, 37 Ohio St. 333, 339; citing Pigot's Case, 11 Coke, 27b; Pollock, Cont. (Wald's Ed.) c. 6.

ance of the servant's employment, and to serve the interests of his employer, the employer is liable.(a)   In affirming this judgment, the rule is perhaps more clearly stated by the New York court of appeals.   A boy eight years of age, attempting to steal a ride upon the platform of the defendant's car, had been kicked off by the conductor or, by a brakeman, as some of the evidence tended to show; and the question was whether, if this evidence were correct, the conductor or brakeman acted within the scope of his authority, so as to bind the company.   It was held that he did, the court saying: "It is conceded that authority in a conductor to remove a trespasser in a lawful manner, whether conferred by the rules or not, is implied, and is incident to his position.   We think the same concession must be made in respect to the authority of the brakeman who finds a trespasser on the platform of a car.   His duties do not primarily pertain to the protection of the cars against intruders; but he is a servant of the company on the train, concerned in its management, and fully cognizant of the obvious fact that intruders, who jump upon the train for a ride, without intention of becoming passengers, are wrongfully there.   Suppose a train was standing still, and a trespasser was put off by force by a brakeman, using no unnecessary violence, would it not be a good defense to an action against him for the assault that he was brakeman, and did the act complained of in that capacity, although without express authority?   The implied authority in such a case is an inference from the nature of the business, and its actual daily exercise, according to common observation and experience.   But, assuming authority in the conductor or brakeman to remove a trespasser in a lawful manner, the question remains whether, when a conductor or brakeman, without warning or notice of any kind, kicks a boy of eight years from the platform of a car, while the train is running at a speed of 10 miles an hour, he can be said to be acting within the scope of his employment, so as to make the company liable for the act.   Assuming the case made by the plaintiff, the act was flagrant, reckless, and illegal; but the point is, was the act within the scope of the employment and authority?   If it was, and the servant, in doing what he did, undertook to act for the company, and not for himself or his own ends, the company is not exonerated, although the servant may have deviated from the instructions in executing the authority, or may have acted without judgment, or even brutally.   The removal of trespassers from the cars was, as we hold, within the implied authority of the defendant's servants on the train.   The fact that they acted illegally in removing the plaintiff while the train was in motion, does not exonerate the defendant.   In some cases, where the existence of an authority in the servant to do a particular act is in controversy, and the authority is sought to be established by inferences and implications, it may be a material circumstance, bearing upon the non-existence of the authority sought to be implied,

(a) Hoffman v. N. Y. Cent. R. Co. 46 N. Y. Sup. (J. & S.) 526, 528; S. C. 44 N. Y. Sup. (J. & S.) 1. See Rounds v. Delaware, etc., R. Co. 64 N. Y. 129. Isaacs v. Third Ave., etc., R. Co. 47 N. Y. 122; Cohen v. Dry Dock, etc., R. Co. 40 N. Y. Sup. (3 J. & S.) 368; S. C. affirmed, 69 N. Y. 170; Jackson v. Second Ave. R. Co. 47 N. Y. 274; Mott v. Consumers' Ice Co. 73 N. Y. 543; Peck v. N. Y. Cent. R. Co. 70 N. Y. 587; Garretzen v. Duenckel, 50 Mo. 104; Bayley v. M., etc., R. Co. L. R. 8 C. P. 148; S. C. in court below, L. R. 7 C. P. 415; Poulton v. London, etc., R. Co. L. R. 2 Q. B. 534; Oliver v. Northern Transp. Co. 3 Or. 84; Garrett v Louisville, etc., R. Co. 3 Am. & Eng. R. Cas. 416, (Sup. Ct. Tenn. 1881.)

that the act was one which the master could not do himself without a violation of law. But this fact would not be decisive. No doubt the kicking of the boy off the car was not only a wrong to the plaintiff, but was a violation of the duty which the train servants owed to the defendant, to exercise proper care in executing the authority confided to them; but in most cases, where the master has been held liable for the acts of a servant, the tortious act was a breach of the servant's duty. In this case, the authority to remove the plaintiff from the car was vested in the defendant's servants. The wrong consisted in the time and mode of exercising it. For this the defendant is responsible, unless the brakeman used his authority as a mere cover for accomplishing an independent and wrongful purpose of his own. The general subject has been recently considered in this court, and it is unnecessary further to elaborate it.(*b*) We think the court would not have been justified in taking the case from the jury."(*c*)

Accordingly, where a boy sued for injuries alleged to have been received by being thrown from a street railway car by the conductor, the following charge was held proper: If the conductor "acted neither maliciously nor with a view to effect some purpose of his own, but within the general scope of his employment, while engaged in defendant's business, and with a view to the furtherance of that business and the defendant's interest, believing from the appearances before him, and upon which he had to exercise his judgment, that his duty to the defendant required him to act, then the defendant is responsible for the manner in which he acted, and the consequences of his act, though he may have acted in excess of his real authority."(*d*)

In a late case in the appellate court of Illinois it is laid down that, while it is a general rule that where an employe goes outside the line of his employment, and, for purposes of his own, inflicts an injury upon the person of one who has no claim upon the employer, arising from any special relation existing between them, the employer is not liable; yet, when applied to the treatment by a common carrier of its passengers, the rule does not apply. The reason of this is said to be that a common carrier owes a duty to passengers that they shall be protected from all danger, so far as the efforts of the carrier and its servants can be made available. The grounds on which the court proceed are thus well expressed by PILLSBURY, J.: "It is impossible for a railroad company, as such, to perform the contract upon its part, as it can act only through its agents and servants. The performance of its contract is intrusted to agents and servants selected by its authority, for their known or presumed fitness to perform the duties assigned to them. The passenger has no voice in the selection of the employes charged with the fulfilling of the company's contract with him; but, relying upon the reasonable presumption that the company has selected competent, faithful, and humane servants, he confidently submits himself to their control and direction until the completion of the contract. The employes of the company have exclusive control of the train. In its operation and management, and in the performance of the company's contract with the passenger, they are the representatives of the company, and as to

(*b*) Citing Higgins v. Watervliet Turnpike Co. 46 N. Y. 23; Rounds v. Delaware, etc., R. Co. 64 N. Y. 129.

(*c*) Hoffman v. N. Y., etc., R. Co. 87 N. Y. 25, 30.
(*d*) Schultz v. Third Ave. R. Co. 46 N. Y. Sup (14 J. & S.) 211.

such passenger they stand in the place of the company, and all their acts, so far as they have a direct connection with the performance or non-performance of the contract, must be held to be acts of the company itself. The company, knowing at the time of entering into the contract for carriage that its servants in charge of the train are the only instrumentalities through and by which it can perform its contract, must be considered as having agreed that such servants should not, either willfully or negligently, violate such contract to the injury of its patron. If the company has stipulated that the passenger shall, during his transit, receive kind treatment at the hands of its servants, appointed by itself to fulfill its agreements in that regard, we fail to perceive why it should not be held liable for a breach of its contract in that respect, as well as in any other. Neither can we fully appreciate the argument that a *negligent* violation of such contract is a breach thereof, while a *willful* one is not. The wrongful act of the employe violates his own contract with his employer at the same time that it violates that of the employer with the passenger. And it seems to us to be more in accord with the reason and philosophy of the law, as well as with a sound public policy, that the master should be held to a reasonably strict accountability for such acts of the servant; and if any one is to look to the servant for indemnity, let it be the employer who has selected such servant, and intrusted him with the fulfilling of the master's duty to the passenger, rather than apply a principle that would confine the remedy of the passenger to an action against a servant, who in many cases might be insolvent, and for whose appointment the injured one is not in any manner responsible. The fact that the servant is liable in tort for his wrongful act, does not lessen the liability of the master, where such act is also a breach of the master's contract. In such case the injured party has his election to sue in *assumpsit* for a breach of contract duty, or in tort for the wrongful injury."(e)

The supreme court of Pennsylvania appears still to adhere to the old idea that if the act of the servant of a railway company in expelling a passenger was "malicious," the company will not be liable. Thus, it is said by that court in a late case: "If the conductor was at the time acting in the line of his duty and within the scope of his employment in putting Toomey off, under the existing circumstances, the company is liable for the act of the conductor, although he may have done it in a careless, negligent, or reckless manner; but for his unauthorized, willful, and wanton or malicious trespass, the company is not liable."(f) In the case in which this language was applied there was evidence tending to show that a person who had no right to ride upon a particular train was pushed off by the conductor while the train was going at the rate of eight miles an hour, in consequence of which he sustained severe injuries. It is obvious that not only the doctrine laid down, but the application in the particular case, is not in accordance with the best modern authorities. It is well settled that a railway company is liable for the unauthorized acts of its employes, as well as for those which are authorized. The words "willful, wanton, and malicious" are little more than epithets referring to

---

(e) Railroad Co. v. Flexman, 9 Bradwell, 250, 254.

(f) Pa. R. Co. v. Toomey, 91 Pa. St. 256, 259; citing Phila., etc., R. Co. v. Wilt, 4 Whart. 143; Passenger R. Co. v. Donahue, 70 Pa. St. 119.

the psychological condition of the actor, and conveying no meaning which can be the foundation of a sound juridical distinction. In another case that court has gone even further, and held that, to maintain an action of trespass *vi et armis* against a railway company for the wrongful act of its train-conductor in ejecting a passenger, it must appear that the act was done by the command or with the assent of the company. When, therefore, a passenger presented a ticket to the conductor, and the conductor refused to honor it, but expelled him from the train, and the only question was whether the ticket was one which entitled him to ride on the particular train, the conclusion was reached that, if the ticket was *not* one which entitled him to ride on the particular train, the passenger could not maintain an action, because the conductor had a right to put him off; and if the ticket *was* one which entitled him to ride on the particular train, the passenger could not recover damages, because, in putting him off, the conductor acted without the authority or assent of the company. The remedy of the passenger in such a case was said to be against the conductor, whose trespass it was.(*g*) It is hard to believe that the highest court in the second state of the American Union administers justice—if that word can be so abused—under such a worn-out rule of law,— a rule which, in such an application, ignores the plainest principles of public right. We seek curiously for the causes which could have led to the preservation of such a rule in that state.

§ 16. DISTINCTION AS TO THE KIND OR GRADE OF SERVANT WHO DID THE ACT. Within the meaning of the above rule, there seems to be no just distinction with reference to the grade or office of the servant who did the act. It will be for the jury to say, in each case, whether the servant who did the act was, in a general sense, acting within the scope of his employment, and in furtherance of his master's business. Thus, in order that a person may recover damages from a railway company for being improperly expelled from its train, or for being expelled therefrom at an improper place, or in an improper manner, it is not necessary that the expulsion should have been done by the *conductor* of the train; he will be entitled to recover if it was done by some other servant of the company acting in the manner above stated.(*a*) Accordingly, damages have been recovered against railroad companies for trespasses committed by their servants, where the wrongful act was done by a porter,(*b*) by a servant employed to clean the cars,(*c*) and, in cases of street railroads, by the driver.(*d*)

§ 17. RIGHT OF PASSENGER TO RESIST UNLAWFUL EXPULSION. It seems that passengers have a right to resist unlawful expulsion, but that they have no right to carry resistance to an extreme point. On the one hand, they have no right to resist for the mere purpose of bringing upon themselves violence, in order to make such violence ground of recovering enhanced damages.* The

---

(*g*) Allegheny Valley R. Co. v. McLain, 91 Pa. St. 442; citing Phila., etc., R. Co v. Wilt, 4 Whart. 142; Yerger v. Warren, 7 Casey, 319.

(*a*) Hoffman v. N. Y. Cent. R. Co. 46 N. Y. Sup. (14 J. & S.) 526.

(*b*) Bayley v. Manchester, etc., R. Co. L. R. 8 C. P. 148; S. C. in court below, L. R. 7 C. P. 115.

(*c*) Northwestern, etc., R. Co. v. Hack, 66 Ill. 238.

(*d*) Lovett v. Salem R. Co. 9 Allen, 557; Cohen v. Dry Dock, etc., R. Co. 40 N. Y. Sup. (8 J. & S.) 368.

*Ante, § 7.

law will not encourage such a degree of resistance, for the further reason that it would lead to breaches of the peace. On the other hand, they are not bound to submit to the indignity and wrong of being expelled from a public conveyance where they rightfully are, without making any resistance whatever. They will in all cases be justified in making sufficient resistance to show that they do not acquiesce in the command to leave the vehicle, and that they leave it under physical compulsion. Now, it is a well-settled principle of law, founded in considerations of obvious justice, that a party who is subjected to an injury must use such means as he reasonably may to prevent an enhancement of the damages which will naturally flow from the injury. It seems to follow that, where a passenger is expelled from a carrier's vehicle, although the expulsion be unlawful or unjustifiable, yet if the passenger resists to an unreasonable extent, such fact may be considered by the jury in mitigation of damages.(a)

In one case, however, the right of the passenger is more strongly put: "When a conductor is in the wrong, the passenger has a right to protect himself against any attempt to remove him, and resistance can lawfully be made to such an extent as may be essential to maintain such a right. Cases occur where circumstances may imperatively require that the passenger should remain on the train on account of others who may be there in his charge, or where it is indispensable that he should hasten on his journey without delay; and if, by reason of the mistaken judgment or willfulness of the conductor, he should be expelled when lawfully there, serious injury might follow. The law does not, under such circumstances, place the passenger within the power of the conductor; and, when lawfully in the cars, he is authorized to vindicate such right to the full extent which might be required for his protection."(b) "But," it has been well observed, "if the conductor has the right to eject the passenger, and is proceeding to do so in a lawful manner, the latter has no right to resist; and if in doing so he receive injury, he will have no one to blame but himself."(c)

§ 18. EXPELLING PASSENGER AT PLACE OTHER THAN REGULAR STOPPING-PLACE. A statute of Texas provides that "if any passenger shall refuse to pay his fare or toll, it shall be lawful for the conductor of the train, and the servants of the corporation, to put him out of the cars, at any usual stopping-place which the conductor may select."(d) The words "usual stopping-place," as above used, are held to mean a regular station or any other place which the company, expressly or impliedly, by use for such purposes, had designated as a proper place for passengers to get on or off its trains, and where they would, in consequence thereof, have the right to demand the exercise of this privilege. A place where trains stop for the purpose of taking on wood and water only, is not a "usual stopping-place" within the meaning of the above statute.(e)

A similar statute exists in Illinois. The term "usual stopping-place," employed therein, means a regular station, at which passengers get on and off

---

(a) Brown v. Memphis, etc., R. Co. 7 Fed. Rep. 51, 65.

(b) English v. Delaware, etc., Canal Co. 66 N. Y. 454.

(c) Hutch. Car. § 593.

(d) Pasch. Dig. Tex. St. art. 4892.

(e) Texas, etc., R. Co. v. Casey, 52 Tex. 112, 122.

the company's trains.(*f*)   Under it, where the passenger is rightfully put off, the only wrong being the wrong of putting him off at a place not a regular stopping-place, the supreme court has shown a disposition not to allow large damages.   They have set aside verdicts for $1,000,(*g*) for $450,(*h*) and for $500.(*i*)   But they have affirmed judgments for $100(*j*) and for $200.(*k*)   Nor does the court favor the giving of exemplary damages in such cases.   The damages are limited to compensation for the actual injury, unless circumstances of aggravation be shown.(*l*)   Where the train from which the passenger is expelled is a freight train, this rule does not require the conductor to cause the train to be drawn up to the platform before expelling the recusant passenger.   The passenger may, although a woman, be put off on a side track, unless it is customary for freight trains to land their passengers at the platform.(*m*)

§ 19. WHETHER CONDUCTOR BOUND TO RECEIVE FARE TENDERED AFTER HE HAS COMMENCED TO PUT PASSENGER OFF.   Where a person is upon a train under circumstances which entitle the conductor to demand payment of fare of him, and he fractiously refuses to pay fare, and the conductor thereupon, as he may rightfully do, signals the train to stop and commences to put him off, if the passenger then changes his mind and offers to pay fare, or if some one offers to pay it for him, the conductor is nevertheless not bound to desist from putting him off.(*a*)   But where the passenger has acted in good faith, if, before the work of putting him off is complete, another passenger tenders his fare for him, the conductor, it has been held, is bound to accept it and desist from putting him off.(*b*)   But the refusal to pay fare does not work a forfeiture of the right of the passenger to ride, under reasonable conditions, upon the payment of his fare; the company cannot visit upon him the punishment of refusing to serve him, upon tendering the price, as it is bound to serve any other member of the public.   While, therefore, the passenger cannot be allowed to experiment with the conductor, who has been compelled to commence stopping his train on account of the former's contumacy, yet if he commences to put him off for refusing to pay his fare at a regular station, at which the train would have stopped in any event, there seems to be no good reason why the conductor should be upheld in refusing to allow him to ride upon tendering the proper amount of fare; and it has been held that such a refusal cannot be justified.(*c*)   But even here, it has been held, he is not entitled to resume his journey unless he pays fare for a passage from the station where he first entered the train.(*d*)

(*f*) Chicago, etc., R. Co. v. Flagg, 43 Ill. 364; Chicago, etc., R. Co. v. Parks, 18 Ill. 465; Terre Haute, etc., R. Co. v. Vanatta, 21 Ill. 188.

(*g*) Terre Haute, etc , R. Co v. Vanatta, 21 Ill. 188; Chicago, etc., R. Co. v. Peacock, 48 Ill. 253.

(*h*) Chicago, etc., R. Co. v. Roberts, 40 Ill. 503.

(*i*) Illinois, etc., R. Co. v. Cunningham, 67 Ill. 316.

(*j*) Chicago, etc., R. Co. v. Flagg, 43 Ill. 364.

(*k*) Illinois, etc., R. Co. v. Johnson, 67 Ill. 312.

(*l*) Toledo, etc., R. Co. v. Patterson, 63 Ill. 304.

(*m*) Illinois Cent R. Co. v. Nelson, 59 Ill. 110.

(*a*) O'Brien v. N. Y., etc., R. Co. 80 N. Y. 236; S. C. 1 Amer. & Eng. R. Cas. 259; Hoffbauer v.

Railroad Co. 52 Iowa, 342; Stone v. Chicago, etc., R. Co. 47 Iowa, 82; O'Brien v. Boston, etc., R. Co. 15 Gray, 20; Hibbard v. N. Y. Cent. R. Co. 15 N. Y. 455; People v. Jillson, 3 Park. Cr. R. 234, 239; Stone v. Chicago, etc., R. Co. 47 Iowa, 89; State v. Campbell, 32 N. J. L. 309.

(*b*) Garrett v. Louisville, etc., R. Co. 3 Amer. & Eng. R. Cas. 416, (Sup. Ct. Tenn. 1881;) S. C. 72 Tenn. (8 Lea,) 438.

(*c*) O'Brien v. N. Y., etc., R. Co. 80 N. Y. 236; S. C. 1 Amer. & Eng. R. Cas. 259.

(*d*) Stone v. Chicago, etc., R. Co. 47 Iowa, 82; S. C. 10 Chi. Leg News, 78; 6 Reporter, 489.

The reason of this rule and of the exception to it seems to be that the passenger, having first broken the contract, cannot afterwards tender performance of it and insist that it shall be reinstated by the carrier; but as the carrier is bound to receive at any regular station any person (with certain exceptions not necessary to notice) who purchases a ticket or tenders fare, it is bound, the train being at a regular station, to make a new contract with the obstinate passenger, the same as it is bound to do so with any other proper person; and it cannot take it upon itself to punish his obstinacy by denying to him the rights which it is bound to extend to the public generally.

The reason of the rule was quite forcibly expressed by DENIO, J.: "Railroad trains are now run according to a scheme in which the time required in passing from one point to another and the time required for the necessary stoppages is accurately calculated. Any disarrangement or departure from the time fixed is exceedingly hazardous to the safety of the company's property and the persons employed in running the train. The most horrible calamities have often been the result of such disarrangements. And if one passenger can by his unjustifiable humor cause the cars to stop, another may do the same thing, and the utmost irregularity may be brought about. The rule, therefore, was, in my judgment, plainly reasonable, which imposed a forfeiture of his right to proceed further on the cars upon a person who should refuse to show his ticket to the conductor when requested. If he forfeited his right by his improper conduct, it was for the company or its agents to say whether he should be retained after having occasioned the inconvenience of the stoppage by his pertinacity."(e)    In addition to this, it is said that "if the rule were otherwise it would enable a passenger so disposed to pay his fare only on compulsion and after the train had stopped, repeating the operation between all stopping points along the route of the road. The passenger must, therefore, stand or fall by the right of the company to expel him. If he incur the exercise of this power, he is at the mercy of the company. If they are wrong, they must respond. If he is in error, he must bear the burden of his folly. He cannot, as suggested, create the facts and circumstances out of his own wrong; he must take the consequences, which are expulsion at the will of the company expressed through its agent, the conductor, and the inconvenience resulting from that incident."(f)

So, where a passenger had exhibited a spent ticket, and insisted on his right to ride upon it, until the conductor stopped the train to put him off, it was held that he could not, on producing a regular ticket, claim the right to be allowed to remain on the train. "In my opinion," said BEASLEY, C. J., "such a doctrine is not consistent with either law or good sense. Its establishment would practically annul the power of a railroad company to require passengers to show their tickets; for it is obvious that, if the only penalty on a refractory passenger is a momentary expulsion, he will be enabled, at a small sacrifice, by repeated refusals, to compel an abandonment of the demand upon him. A passenger takes his ticket subject to the reasonable regulations of the company; it is an implied condition in his contract that he will submit to such regulations; and if he willfully refuses to be bound by them,

---

(e) Hibbard v. N. Y., etc., R. Co. 15 N. Y. 455.      (f) Nelson v. Long Island R. Co. 7 Hun, 140, 145, per Brady, J.

by so doing he repudiates his contract, and, after such repudiation, cannot claim any right under it. In this case, the passenger, with full knowledge of the regulation in question, refused to show his ticket, which alone gave him a right to a seat in the cars. The exhibition of the spent ticket did not help the matter; he stands, therefore, on the same footing as any other passenger who, when properly applied to, will not exhibit the evidence of his rightful presence in the car. If this particular passenger had the legal right to re-enter the cars after his tortious refusal, so, on all similar occasions, will all other passengers be entitled to the same right. We come thus to the result that railroad passengers may violate, with full knowledge, a legal regulation of a company in whose cars they are carried; they may resist, short of a breach of the peace, all attempts to expel them; they may, by this means, at a loss to the company, and to the peril of the public, disarrange the order of successive trains upon the road with regard to each other; they may occasion a tumult and disorder in the car in which they may happen to be; and, after being expelled, they may immediately return to repeat, if so inclined, the same misconduct. I must think it requires no argument to show that such a license to do evil as this does not exist."(*g*)

In like manner the supreme court of Iowa hold that if a passenger refuses to pay his fare when demanded, the conductor may rightfully put him off, although he offers to pay it before he is actually expelled. "The rule," says ADAMS, J, "that a passenger may contest the regulations of the company and the firmness of the conductor by refusing to pay full fare, and still save himself from expulsion by tendering full fare after expulsion has commenced, is not only uncalled for for the just protection of the recusant passenger, but would tend to encourage a practice, which, if indulged in, would interfere with the convenience of the company, and the dispatch and quiet to which other passengers are entitled."(*h*)

§ 20. WHETHER THE COMPANY, BEFORE EXPELLING THE PASSENGER, MUST REFUND THE UNEARNED PASSAGE MONEY. Where a traveler, on the faith of representations made to him by the company's agent, stops over on his ticket and attempts to resume his journey on the same ticket after it has, by its terms, expired, the conductor cannot lawfully expel him from the train without first restoring to him that portion of the passage money which is represented by that part of the transit called for by the ticket which has not yet been made, or deducting it from the fare claimed for the rest of the journey. The ticket is evidence that the fare has been paid for the entire transit, and there is no rule, founded in sense or justice, which will allow the company to keep the passenger's money, where he has acted in good faith, without transporting him over the route for which he has paid.(*a*)

In a late case the plaintiff entered the defendant's cars without procuring a ticket, and handed to the conductor the ticket fare. The conductor afterwards demanded of the plaintiff the additional amount required by the rules of the company to be paid by persons who had not purchased tickets before entering the train. This the plaintiff refused to pay. The conductor thereupon, without first offering to return the amount which the plaintiff had paid

(*g*) State v. Campbell, 32 N. J. L. 309, 312.
(*h*) Hoffbauer v. Railroad Co. 52 Iowa, 342.

(*a*) Burnham v. Grand Trunk R. Co. 63 Me. 298, 303.

him, stopped the train. As soon as he had signaled to stop the train, the plaintiff offered to pay the rest of the sum demanded, but the conductor, carrying out a rule of the company not to accept fare after the train had been signaled to stop in order to put a passenger off for non-payment of fare, refused this, laid hold of the passenger, dragged him out of the car, and, as the plaintiff was in the act of leaving the car, handed to him the money which he had paid. It was held that the company was liable to pay damages. If the conductor accepted, without objection, the money tendered by the passenger as payment of full fare, he could not thereafter change his mind and demand the extra fare; nor could he commence proceedings to put the plaintiff off, without first returning to him the money which he had paid.(*bb*)

§ 21. DETAINING PASSENGERS FOR NON-PAYMENT OF FARE. Where a railroad company had a regulation that passengers on leaving its trains must exhibit their tickets to the gateman at the company's station, and a passenger tried to pass out without exhibiting his ticket, alleging that he had lost it, and the gateman thereupon detained him, and caused him to be arrested and confined in the police station over night, on the charge of disorderly conduct, and he was discharged by the police justice the next morning, it was held that he could maintain an action against the company for false imprisonment. The power which the company sought to exercise was not like the power to expel a passenger from its cars for non-payment of fare, but it was the power to imprison for debt.(*a*)

## IV. As to Damages.

§ 22. MEASURE OF DAMAGES FOR EXPULSION OF PASSENGER. In an action for damages for refusing to carry the plaintiff in defendant's cars, the following facts appeared. The plaintiff, a colored woman, the wife of a colored preacher, having purchased a first-class ticket, applied for admission into a first-class car and was refused, and directed to go into the smoking car, where there were none but men, and some of them smoking. This she refused to do, and left the cars. She was lady-like in appearance, and at the time carried a sick child in her arms. The court instructed the jury that she was entitled to such damages as would make her whole; and that, in estimating such damages, the jury should consider the loss of time, the inconvenience she had been put to, and the probable amount of expenses incurred in the vindication of her rights. The jury returned a verdict for $1,000.(*b*)

The rule thus laid down that the jury, in estimating the plaintiff's damages, may take into consideration the expenses incurred by him in the litigation, has been held allowable in courts of law, where the case is a proper one for exemplary damages.(*c*) Such expenses are allowed by statute in Georgia, " when the defendant has acted in bad faith, and been stubbornly litigious, or

(*bb*) Bland v. Southern Pac. R. Co. 55 Cal. 570; S. C. 3 Amer. & Eng. R. Cas. 285.

(*a*) Lynch v. Metropolitan, etc., R. Co. 24 Hun, 506. See Chilton v. London, etc., R. Co. 16 Mees. & W. 212.

(*b*) Gray v. Cincinnati Southern R. Co. 11 Fed. Rep. 683, before Swing, J.

(*c*) Beecher v. Derby Bridge Co. 24 Conn. 496; Lindsley v. Bushnell, 15 Conn. 235; Welch v. Durand, 36 Conn. 182; Dalton v. Beers, 38 Conn. 429; New Orleans, etc., R. Co. v. Allbritton, 38 Miss. 242; Landa v. Obert, 45 Tex. 539; Finney v. Smith, 31 Ohio St. 529.

has caused the plaintiff unnecessary trouble and expense."(*d*)   In admiralty, where, as is well known, the rules as to the measure of damages are not the same as in courts of law, such expenses have been likewise allowed in the case of an injury to a passenger at sea.(*e*)   But the propriety of allowing counsel fees to be taken into consideration in estimating exemplary damages has been denied by some of the best courts.(*f*)

§ 23. EXEMPLARY DAMAGES IN SUCH CASES.   It has been well said that " there is no class of cases where the doctrine of exemplary damages can be more beneficially applied than in the case of railroad corporations in their capacity of common carriers of passengers;"(*a*) and the courts are in the constant habit of upholding the giving of exemplary damages in the case of the wrongful expulsion of passengers from railway trains.(*b*)   The grounds on which these damages have been generally given are gross misconduct towards the passenger on the part of the company's servants;(*c*) but they have also been given where the agent acted without unnecessary violence and upon conscientious views of his duty.   The injury which will entitle a passenger to such damages may consist in the act of the conductor in executing a rule of the company, as where, without malice on the part of the conductor, a well-behaved woman is expelled from a first-class car on account of her color.(*dd*)   Here it will be no reason for instructing the jury that they should not give exemplary damages that the conductor acted without malice; for, in such cases, punitive damages may be inflicted for the purpose of enforcing upon the corporation obedience to the duties required of it as a common carrier.(*ee*)

" The only way carriers of passengers can be held to reasonable regulations, is by allowing juries to inflict punitive damages for a violation of the rights of the public; and the establishment of unreasonable regulations is the *gravamen* of the offense, that being a disregard of the rights of the public for which the carrier is punished.   The mere price of a ticket or refunding of the money will not answer the purpose in all cases; that would be simply to permit the carrier to enforce the unreasonable regulation, because he would never claim to keep the money while refusing to render the service.   He would take no money, or refund all received, and go on with his business in his own way, and the plaintiff or the public would be no better off.   This rule of damages

(*d*) Code Ga. (Ed. of 1873) § 2942.   See Savannah v. Waldner, 49 Ga. 316; Gurnsey v. Shellman, 59 Ga. 797.

(*e*) The Oriflamme, 3 Sawy. 397, 404.

(*f*) Day v. Woodworth, 13 How. 363; Oelrichs v. Spain, 15 Wall. 211; Fairbanks v. Witter, 18 Wis. 287; Earl v. Tupper, 45 Vt. 275; Hoadley v Watson, Id. 289; Kelly v. Rogers, 21 Minn. 145; Howell v. Scoggins, 48 Cal. 355; Falk v. Waterman, 49 Cal. 224.   And see Lincoln v. Schenectady, etc., R. Co. 23 Wend. 425.   The costs of prior litigation are recoverable as damages on the principle of compensation, where they have flowed as the necessary or proximate result of the wrong done the plaintiff,—as in actions for malicious prosecution or false imprisonment.   Pritchet v. Doevey, 1 Cro. & M. 775; Bonesteel v. Bonesteel,

30 Wis. 511; Blythe v. Thompkins, 2 Abb. Pr. 468; Foxall v. Barnett, 22 Eng. Law & Eq. 179; Parsons v. Harper, 16 Grat. 64.   But see Strang v. Whitehead, 12 Wend. 64; Bradlaugh v Edwards, 11 C. B. (N. S.) 377.

(*a*) Goddard v. Grand Trunk R. Co. 57 Me. 202; S. C. 2 Amer. Rep. 39; Haley v. Mobile, etc., R. Co. 7 Baxt. 243; Garrett v. Louisville, etc., R. Co. 3 Amer. & Eng. R. Cas. 416, (Sup. Ct. Tenn. 1881.)

(*b*) Brown v. Memphis, etc., R. Co. 7 Fed. Rep. 51; Evans v. St. Louis, etc., R. Co. 11 Mo. App.

(*c*) See the discussion of this question in Milwaukee, etc., R. Co. v. Armstrong, 91 U. S. 489; also Ackerson v. Erie R. Co. 32 N. J. L. 254, 260.

(*dd*) Railroad v. Brown, 17 Wall. 446; Brown v. Memphis, etc., R. Co. 7 Fed. Rep. 51, 63.

(*ee*) Brown v. Memphis, etc., R. Co supra.

would be simply rescinding the contract to carry, which is all the carrier demands, and sufficient for his purpose."(*f*)

§ 24. INSTANCES OF THE AMOUNT OF DAMAGES. A boy eight years old jumped upon a street-railway car, having money in his pocket to pay his fare. After the car had proceeded about a block, the conductor came from inside the car, when another boy, who had got upon the car, put his hand to his nose and jumped off. Thereupon the conductor, without asking the former boy for his fare, or giving him an opportunity to pay it, and without stopping the car, threw him off from it. He fell on the defendant's other track, about four feet distant, and another of the defendant's cars, which had this moment come up the track, ran over him. His collar-bone was broken, so that it protruded from the skin. His second and third ribs were also broken. His right arm was broken near the shoulder in four or five pieces. The small bone of his left arm was broken near the wrist, and so was his thigh joint between the middle and upper third. There were great contusions and abrasions, and.the boy was permanently injured and deformed. The court could not say that $15,000 were an excessive award of damages for such injuries.(*a*)

Where a person purchased a collector's certificate of the payment of a certain sum as railroad taxes, which was more than the amount of fare, according to the company's regular schedule of fare, for the distance which he desired to travel, and got upon the train in good faith, supposing that this would pay his fare, there being no agent at the station where he got upon the train to inform him of his error, and presented such certificate to the conductor when his fare was demanded, who refused to receive it, and demanded the payment of the fare in money, which the plaintiff was unable to pay, and thereupon the conductor took hold of him to put him off the train, when a fellow-passenger, out of motives of humanity, offered to pay the fare demanded, which the conductor refused, but put the plaintiff off the train, it was held that the company was liable, that it was a case for exemplary damages, and that $2,000 damages were not excessive.(*b*)

A well-dressed colored woman was put out of the lady's car because of her color, and also because of a claim, on the part of the conductor, that she was known to him to be a woman of lewd character. She resisted, and a good deal of force had to be used in expelling her. Her testimony showed that her thumb was dislocated, and that she was severely choked, while other testimony tended to show that no unnecessary violence was used. It was held that an award of $3,000 was not so gross as to authorize the court to set aside the verdict, though the learned judge would have been better satisfied if it had been smaller.(*c*)

The wife of an employe of a railroad company got upon the train without a pass, having been told that she would be allowed to ride free without a pass being required of her. The conductor ordered her to leave the train, not at a station, but at a water-tank where the train had stopped. Her petition al-

(*f*) Id., per Hammond, J.
(*a*) Schultz v. Third Ave. R. Co. 46 N. Y. Sup. (14 J. & S.) 211.

(*b*) Garrett v. Louisville, etc., R. Co. 3 Amer. & Eng. R. Cas. 416, (Sup. Ct. Tenn. 1831.)
(*c*) Brown v. Memphis, etc., R. Co. 7 Fed. Rep. 51, 62.

leged that she offered to explain to the conductor why she had no written pass, but he refused to receive her explanation, and put her off the train in the presence of a large number of passengers, in a "rude, wanton, and malicious manner." She claimed that, in consequence of being so put off, she was greatly mortified, frightened, had to walk with her infant child in her arms, two or three miles, and, in consequence thereof, suffered a miscarriage. The jury were instructed that, under the pleadings, they could not give exemplary damages; but that they must confine their verdict to "such actual damages" as the evidence should satisfy them were suffered "pecuniarily, and in feelings, injuries, and sufferings resulting from an unlawful act." The evidence is not set out, but, in the opinion of the court, it is said to have preponderated in favor of the defendant. The jury, under the instructions, returned a general verdict for $2,500, and the supreme court refused to set it aside.(d)

Where a passenger, after having been carried but a few miles, was put off from a railway train, was detained but a few hours, and suffered no special damage from inconvenience and loss of time, a verdict for $750 was held excessive.(e)                                      SEYMOUR D. THOMPSON.

*St. Louis, Missouri.*

(d) Texas, etc., R. Co. v. Casey, 52 Tex. 112.          (e) Houston, etc., R. Co. v. Ford, 53 Tex. 364.